## HEUBLEIN, INC. *v.* SOUTH CAROLINA TAX COMMISSION

No. 71–879.   Argued November 13, 1972—
Decided December 18, 1972

MARSHALL, J., delivered the opinion of the Court, in which BURGER, C. J., and DOUGLAS, BRENNAN, WHITE, POWELL, and REHNQUIST, JJ., joined.   BLACKMUN, J., filed a statement concurring in the result, *post,* p. 284.   STEWART, J., took no part in the consideration or decision of the case.

*Stephen M. Piga* argued the cause for appellant.   With him on the briefs was *W. Croft Jennings, Jr.*

*G. Lewis Argoe, Jr.,* Assistant Attorney General of South Carolina, argued the cause for appellee.   With him on the brief were *Daniel R. McLeod,* Attorney General, and *Joe L. Allen, Jr.,* and *John C. Von Lehe,* Assistant Attorneys General.

*Mr. Piga* filed a brief for the Distilled Spirits Institute as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed by *Solicitor General Griswold, Assistant Attorney General Crampton,* and *Ernest J. Brown* for the United States, and by *William D. Dexter,* Assistant Attorney General of Washington, and *Eugene F. Corrigan* for the Multistate Tax Commission.

Mr. Justice Marshall delivered the opinion of the Court.

In this case we must determine whether South Carolina may tax the income from local sales of Heublein's products, consistent with the limitations on the State's power to tax imposed by 15 U. S. C. § 381 (a).[1] The South Carolina Tax Commission assessed Heublein, Inc., a Connecticut corporation that produces alcoholic beverages, a total of $21,549.50 in taxes on income derived from the sale of its goods in South Carolina.[2] After a hearing before the Tax Commission, Heublein paid the taxes and brought suit to recover them. The Court of Common Pleas held that § 381 (a) protected Heublein from tax liability in South Carolina. The Supreme Court of South Carolina reversed. 257 S. C. 17, 183 S. E. 2d 710. We noted probable jurisdiction, 405 U. S. 952 (1972), and now affirm. We hold that Heublein's activities within South Carolina exceed the minimum standards established in 15 U. S. C. § 381 (a),

---

[1] Title 15 U. S. C. § 381 (a) provides in pertinent part:

"No State . . . shall have power to impose . . . a net income tax on the income derived within such State by any person from interstate commerce if the only business activities within such State by or on behalf of such person . . . are either, or both, of the following:

"(1) the solicitation of orders by such person, or his representative, in such State for sales of tangible personal property, which orders are sent outside the State for approval or rejection, and, if approved, are filled by shipment or delivery from a point outside the State; and

"(2) the solicitation of orders by such person, or his representative, in such State in the name of or for the benefit of a prospective customer of such person, if orders by such customer to such person to enable such customer to fill orders resulting from such solicitation are orders described in paragraph (1)."

[2] A license tax, which is predicated upon liability for income taxes, was also assessed and paid. S. C. Code Ann. § 65–606 (1962). There is no dispute over the amount for which Heublein is liable under this statute.

and that South Carolina may, pursuant to an otherwise valid regulatory scheme, compel Heublein to undertake activities that take it beyond the protection of 15 U. S. C. § 381 (a).

I

During the years in question, Heublein had one employee in South Carolina. He maintained an office in his home and a desk at the warehouse of Ben Arnold Co., the local distributor of Heublein's products. Heublein's representative briefed Ben Arnold's salesmen on Heublein's products, and traveled throughout the State to liquor retailers, telling them of the products and leaving promotional literature with them. Ordinarily, the retailers sent orders directly to Ben Arnold, but occasionally Heublein's representative transmitted them. Ben Arnold, in turn, placed its orders with Heublein's home office in Connecticut. Heublein then acknowledged its acceptance of the orders and indicated to Ben Arnold when the goods would be shipped. They were sent by common carrier consigned to Heublein in care of its representative at the premises of Ben Arnold.

This arrangement, which served none of Heublein's business interests, was adopted to conform to the requirements of the South Carolina Alcoholic Beverage Control Act. S. C. Code Ann. § 4–1 *et seq.* (1962 and Supp. 1971). Under that Act, only registered producers of registered brands of alcoholic beverages may ship those brands of alcoholic beverages into the State. §§ 4–134, 4–135. Such producers must have a resident representative who has no direct or indirect interest in a local liquor business. §§ 4–131 (3), 4–139. Shipments of liquor into the State may be made only to the producer in care of its representative. § 4–141. Prior to the shipment, the producer must mail a copy of the invoice showing the quantity and price of the items shipped, and a copy of the bill of lading, to the Alcoholic Beverage Control

Commission. Immediately after accepting delivery, the representative must furnish the Commission a copy of the invoice showing the time and place of delivery. *Ibid.* When received, the shipment must be stored in a licensed warehouse of the producer, or, after delivery is complete, the shipment may be transferred to a licensed wholesaler. §§ 4–140, 4–141. Before the goods are shipped to a wholesaler, however, the representative must obtain the Commission's permission to make the transfer. § 4–141. Heublein complied with this regulatory scheme.

## II

Title 15 U. S. C. § 381 (a)(1), on which Heublein relies, provides that no State shall have power to impose a net income tax on income derived within the State from interstate commerce if the recipient of the income confined its business within the State to "the solicitation of orders . . . in such State for sales of tangible personal property, which orders are sent outside the State for approval or rejection, and, if approved, are filled by shipment or delivery from a point outside the State."

We need not decide whether, as the State urges, the actions of Heublein's representative in maintaining a local office, meeting with retailers, distributing promotional literature, and personally delivering some orders to the wholesaler, do not fall within the term "solicitation." Compare *Smith Kline & French* v. *Tax Comm'n,* 241 Ore. 50, 403 P. 2d 375 (1965), with *Clairol, Inc.* v. *Kingsley,* 109 N. J. Super. 22, 262 A. 2d 213, aff'd, 57 N. J. 199, 270 A. 2d 702 (1970), appeal dismissed, 402 U. S. 902 (1971). For here Heublein has done more than just those acts. It sent its products to its local representative who transferred them to a local wholesaler. This transfer occurred within the State and clearly was neither "solicitation" nor the filling of

orders "by shipment or delivery from a point outside the State" within the meaning of § 381 (a)(1).

Heublein contends, however, that the transfer never would have occurred had not South Carolina required it as a condition of conducting business within the State. Heublein argues that a State may not evade the purpose of § 381 (a) by requiring a firm to do more than solicit business within the State and then taxing the firm for engaging in this compelled additional activity.

If we were persuaded that South Carolina has evaded the intent of the statute we would, of course, be reluctant to uphold its actions. But that is not what South Carolina has done here. The legislative history of § 381 shows that Congress had rather limited purposes which are not evaded by South Carolina's regulation of liquor sales in the manner it has chosen. Congress did not focus on the consequences of its actions for such local regulatory schemes. We therefore will not read the statute as prohibiting the States from adopting such schemes, even when the regulation requires the producer to have more than the minimum contacts with the State for which § 381 provides tax immunity. Such a reading would require us to assume that Congress carefully considered the difficult problems of accommodating the federal interest in an open national economy with local interest in regulating the sale of liquor. The evidence is clear that Congress did not do so.

The impetus behind the enactment of § 381 was this Court's opinion in *Northwestern States Portland Cement Co.* v. *Minnesota,* 358 U. S. 450 (1959). There we held that "net income from the interstate operations of a foreign corporation may be subjected to state taxation provided the levy is not discriminatory and is properly apportioned to local activities within the taxing State forming sufficient nexus to support the same." 358 U. S., at 452. Congress promptly responded to the "consid-

erable concern and uncertainty" [3] and the "serious apprehension in the commercial community" [4] generated by this decision by enacting Pub. L. 86–272, 73 Stat. 555, 15 U. S. C. § 381, within seven months.

In this statute, Congress attempted to allay the apprehension of businessmen that "mere solicitation" would subject them to state taxation. Such apprehension arose because, as businessmen who sought relief from Congress viewed the situation, *Northwestern States Portland Cement* did not adequately specify what local activities were enough to create a "sufficient nexus" for the exercise of the State's power to tax. [5] Section 381 was designed to define clearly a lower limit for the exercise of that power. Clarity that would remove uncertainty was Congress' primary goal. By establishing such a limit, Congress did, of course, implicitly determine that the State's interest in taxing business activities below that limit was weaker than the national interest in promoting an open economy. But it did not address the questions raised by a requirement, incident to a valid regulatory scheme, that a business undertake activities above the limit as a condition of doing business within the State. [6]

---

[3] S. Rep. No. 658, 86th Cong., 1st Sess., 2.

[4] H. R. Rep. No. 936, 86th Cong., 1st Sess., 1.

[5] See, *e. g.,* S. Rep. No. 658, *supra,* n. 3, pp. 2–3: "Persons engaged in interstate commerce are in doubt as to the amount of local activities within a State that will be regarded as forming a sufficient 'nexus,' that is, connection, with the State to support the imposition of a tax on net income from interstate operations and 'properly apportioned' to the State."

[6] That Congress was untroubled by those questions is suggested by its emphasis on the increased overhead and recordkeeping that local taxation of minimal activities would cause. See, *e. g., id.,* at 4; H. R. Rep. No. 936, *supra,* n. 4, p. 2: "These businesses are concerned not only with the costs of taxation, but also with the inescapable fact that compliance with the diverse tax laws of every jurisdiction in which income is produced will require the maintenance of records for each jurisdiction and the retention

Congress recognized, instead, that the accommodation of local and national interests in this area was a delicate matter. The committees reporting the bill to the House and Senate emphasized the difficulty of devising appropriate limitations on state taxing powers. Both Committees called their bills temporary solutions to meet only the most pressing problems created by *Northwestern States Portland Cement.*[7] More comprehensive legislation could only follow careful study, in the Committees' view. Congress agreed, and in Title II of Pub. L. 86–272, provided that the Committee on the Judiciary of the House of Representatives and the Committee on Finance of the Senate study the entire problem of state taxation of interstate commerce.[8]

Congress, then, did not address in § 381 the problem of taxing a business when it undertook local activities simply in order to comply with the requirements of a valid regulatory scheme. Such regulation is an important function of local governments in our federal scheme. As we said last Term, "unless Congress conveys its purpose

of legal counsel and accountants who are familiar with the tax practice of each jurisdiction." Where a valid regulatory scheme requires that records be kept, the overhead costs about which Congress was concerned might not rise substantially when a state income tax was imposed. South Carolina's scheme for regulating liquor does little more than require that Heublein keep certain records.

[7] H. R. Rep. No. 936, *supra*, n. 4, p. 2; S. Rep. No. 658, *supra*, n. 3, pp. 4–5: "Your committee recognizes that the bill it has reported is not a permanent solution to the problem that exists. It was not intended to be. Your committee . . . recognizes that the problem is a complex one which requires extensive and exhaustive study in arriving at a permanent solution fair alike to the States and to the Nation. Your committee believes, however, that the bill it has reported will serve as an effective stopgap or temporary solution while further studies are made of the problem."

[8] This report is published as H. R. Rep. No. 1480, 88th Cong., 2d Sess., H. R. Rep. No. 565, 89th Cong., 1st Sess., and H. R. Rep. No. 952, 89th Cong., 1st Sess.

clearly, it will not be deemed to have significantly changed the Federal-State balance." *United States* v. *Bass,* 404 U. S. 336, 349 (1971).

Congress of course did not enact in § 381 a statute which a State can deliberately evade by requiring a firm to undertake more than mere solicitation. When a State enacts a regulatory scheme that serves legitimate State purposes other than assuring that the State may tax the firm's income, it is not evading § 381; it is pursuing permissible ends in a manner that Congress did not address. Thus, if South Carolina's system of regulating the sale of liquor is valid, § 381 does not prohibit taxation of Heublein's local sales.[9]

### III

South Carolina's Alcoholic Beverage Control Act is a long and detailed statute. Requirements that certain records be kept by the manufacturer, the wholesaler, and the retailer pervade the scheme. There must be complete records of the quantities, brands, and prices involved at every stage of each liquor sale. By requiring manufacturers to localize their sales, South Carolina establishes a check on the accuracy of these records. For

---

[9] MR. JUSTICE BLACKMUN, in his separate statement, suggests that § 381 does proscribe what South Carolina has done here, but that the Twenty-first Amendment prohibits such an action by Congress. In his view, to the extent that § 381 prohibits taxing activities undertaken in order to comply with a regulation valid under the Twenty-first Amendment, it is unconstitutional. We prefer to read the statute and its legislative history, ambiguous though they may be, to avoid such a holding. Cf. *United States* v. *Jin Fuey Moy,* 241 U. S. 394, 401 (1916). And, though the relation between the Twenty-first Amendment and the force of the Commerce Clause in the absence of congressional action has occasionally been explored by this Court, we have never squarely determined how that Amendment affects Congress' power under the Commerce Clause. Cf. *Schwegmann Bros.* v. *Calvert Distillers Corp.,* 341 U. S. 384 (1951).

example, when a manufacturer can transfer its goods to a wholesaler in the State only after it submits an invoice showing the price and after it receives permission for the transfer, it is easier for the State to enforce its requirement that the wholesale price in South Carolina be no higher than that elsewhere in the country. S. C. Code Ann. § 4–137.1 (Supp. 1971). The requirement that sales be localized is, unquestionably, reasonably related to the State's purposes and is not simply an attempt by the State to provide a basis for the taxation of an out-of-state seller's local sales.

Nor does this requirement violate the Commerce Clause. The Twenty-first Amendment, § 2, provides that "[t]he transportation or importation into any State . . . for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited." As this Court said in *Hostetter* v. *Idlewild Bon Voyage Liquor Corp.*, 377 U. S. 324, 330 (1964):

> "This Court made clear in the early years following the adoption of the Twenty-first Amendment that by virtue of its provisions a State is totally unconfined by traditional Commerce Clause limitations when it restricts the importation of intoxicants destined for use, distribution, or consumption within its borders."

The requirement that, before engaging in the liquor business in South Carolina, a manufacturer do more than merely solicit sales there, is an appropriate element in the State's system of regulating the sale of liquor.[10]

---

[10] In upholding a comprehensive scheme of liquor regulation rather similar to South Carolina's, this Court said:

"[The State] has seen fit to permit manufacture of whiskey only upon condition that it be sold to an indicated class of customers and transported in definitely specified ways. These conditions are

The regulation in question here is therefore valid, and § 381 (a) does not apply. The judgment of the Supreme Court of South Carolina is

*Affirmed.*

MR. JUSTICE STEWART took no part in the consideration or decision of this case.

MR. JUSTICE BLACKMUN, being of the opinion that the Twenty-first Amendment provides the sole authority for what South Carolina has required of Heublein by its Alcoholic Beverage Control Act and, to that extent, overrides what otherwise would be proscribed by 15 U. S. C. § 381, concurs in the result.

---

not unreasonable and are clearly appropriate for effectuating the policy of limiting traffic in order to minimize well-known evils . . . ." *Ziffrin, Inc.* v. *Reeves,* 308 U. S. 132, 139 (1939). Cf. *Duckworth* v. *Arkansas,* 314 U. S. 390 (1941); *Carter* v. *Virginia,* 321 U. S. 131 (1944).