ANDREW, J. T. C.
Plaintiff, a foreign corporation, seeks review in this court of a determination by defendant Director, Division of Taxation, that plaintiff was subject to tax under the New Jersey Corporation Business Tax Act, N.J.S.A. 54:10A-1 et seq., (“act”) for the years 1961 to 1976, inclusive.
The act imposes a franchise or privilege tax upon every domestic and foreign corporation
... for the privilege of having or exercising its corporate franchise in this State, or for the privilege of doing business, employing or owning capital or property, or maintaining an office, in this State.... [N.J.S.A. 54:10A-2.]
*323 The sole question presented is whether the nature, extent and scope of plaintiff’s activities in New Jersey were sufficient to provide a jurisdictional base upon which New Jersey could tax plaintiff pursuant to the Act.
Ringgold Coal Mining Company (“Ringgold”) is a Pennsylvania corporation engaged primarily in the coal brokerage business in New York, Pennsylvania and Delaware. It is also engaged in a very limited coal mining operation in Pennsylvania. During the years in question its executive, accounting and sales offices were located in Kittanning, Pennsylvania.
Due to the nature of the coal business, Ringgold rarely maintained inventories. Usually Ringgold bought coal from a coal producer at a mine site and would take temporary possession of the coal until it released it to a customer.
During the years in question plaintiff employed nine people, including three salesmen and two coal inspectors. In November 1962 one of plaintiff’s employees, Arthur F. Sherman, moved to a residential neighborhood in Somerset, New Jersey. Sherman, a senior vice-president of Ringgold, chose this location because of its proximity to the three principal states he was serving (New York, Pennsylvania and Delaware). Ringgold did not require him to move to New Jersey.
Sherman equipped one of the bedrooms of his residence with some standard office equipment, namely, a telephone, a file cabinet, an IBM electric typewriter, stamps and stationery imprinted with Ringgold’s letterhead. The letterhead listed only the address of plaintiff’s Kittanning, Pennsylvania, office. Ringgold did not reimburse Sherman for maintenance of the above-mentioned room. Initially Sherman shared this bedroom with his son, until his son left the family residence. There is no indication of when this occurred.
Sherman used the IBM typewriter to type all his business correspondence and all business records that were sent to Pennsylvania. The file cabinet housed all the business correspondence.
*324 The record [1] indicates that Sherman’s residence contained a telephone which was listed in the telephone directory under both Ringgold’s name and Sherman’s name. Sherman’s testimony on deposition reveals that in 1962 the only way he could obtain a private line was to register the telephone in Ringgold’s name. There is no proof, however, that, in later years a private line could not have been obtained in Sherman’s own name. The telephone number of this private line and the New Jersey address appeared on Sherman’s business cards along with Ring-gold’s Pennsylvania address and telephone number. All bills for the business line were sent to and paid for directly by Ringgold.
Throughout his employment with Ringgold, Sherman had the use of an automobile. Initially, the automobile was leased, apparently in New York, in Sherman’s name to take advantage of lower rental rates. Subsequently, Ringgold purchased automobiles for Sherman’s use and registered them in New Jersey. The leasing costs and other car related expenses were paid by plaintiff.
As Ringgold’s senior vice-president, Sherman was specifically responsible for sales. His position, however, did not give him the authority to accept orders. Acceptance of all orders was subject to the approval of Ringgold’s president or secretary-treasurer. In New Jersey Sherman solicited sales from Public Service Electric and Gas and at one point in time arranged for sales to Atlantic City Electric. As indicated on the returns filed by plaintiff, its sales to New Jersey customers ranged from $26,652 to $1,625,709 during the years 1965 to 1976.
Sherman solicited primarily outside of New Jersey. When he first moved to New Jersey he frequently conducted his sales in person. After awhile he became successful in conducting business over the telephone from his New Jersey residence. Long *325 standing customer relationships extending over a period of 20 to 25 years permitted him to conduct business in this manner.
Sherman used the telephone for three major purposes other than soliciting orders. He spoke to customers who had problems or complaints regarding their coal purchases. For the most part the complaints centered on the grade of the coal. Variations in grade were not unusual due to the fact that coal is a natural and not a manufactured product. If Sherman determined the complaints were well founded and the customer was entitled to a remedy, rather than return the misgraded coal back to the mine, Sherman would see to the necessary financial adjustments.
Additionally, the telephone was the medium utilized to handle collection of delinquent accounts. Ringgold personnel in Pennsylvania were instructed to contact Sherman when any one of his accounts became delinquent. Plaintiff felt that since Sherman had originally negotiated the account, the relationship between Ringgold and its customer would be least strained if Sherman were the person who attempted to encourage payment. On occasion, he also became involved with determining whether credit should be extended to new accounts.
Finally, Sherman used the telephone to supervise two salesmen and two coal inspectors. The record does not indicate the frequency of these contacts over the telephone nor the location of the salesmen and coal inspectors when Sherman performed his supervisory functions.
For performance of the aforementioned duties, Sherman received between 9% and 26% of all wages, salary and other personal service compensation paid by Ringgold. The evidence did not specifically indicate, but apparently Ringgold did not maintain a bank account within New Jersey.
During the period of 1961 through 1976 plaintiff did not file New Jersey Corporation Business Tax returns. However, notification by the Division of Employment Security to defendant that plaintiff had employees in New Jersey prompted a routine investigation by defendant which resulted in defendant’s determination that plaintiff’s activities were within the reach of the New Jersey Corporation Business Tax.
*326 Thereafter Ringgold filed returns, under protest, and paid the resulting tax without interest. Subsequently, it filed this appeal seeking a refund of the assessment paid and an abatement of the interest and penalties involved.
For the years 1961 to 1968 the tax did not exceed $116 for any one year. For the years 1969 to 1976, the tax was as follows:
1969 $ 293.14
1970 558.64
1971 93.20
1972 50.00
1973 400.84
1974 5,330.17
1975 1,306.39
1976 171.73
Whether the tax is called a “net income” tax, a tax on a corporation’s “going concern value” or a tax on the privilege of engaging in business (as in New Jersey), a state can constitutionally tax a corporation that engages solely in interstate commerce. Complete Auto Transit Inc. v. Brady, 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed2d 326 (1977). If the tax is fairly apportioned and does not discriminate against interstate commerce, the United States Supreme Court has permitted a state to
... pursue its own fiscal policies, unembarrassed by the Constitution, if by the practical operation of a tax the state has extended its power in relation to opportunities which it has given, to protection which it has afforded, to benefits which it had conferred by the fact of being an orderly, civilized society. [Wisconsin v. J. C. Penney Co., 311 U.S. 435, 444, 61 S.Ct. 246, 249, 85 L.Ed. 267 (1940).]
However, a state tax which affects interstate commerce must not offend constitutional concepts of due process. The due process clause of the Fourteenth Amendment imposes two requirements to a state’s authority to tax income generated by the activities of an interstate business: (1) a “minimal connection” between the interstate activities and the taxing state, and (2) a rational relationship between the income attributed to the state and the intrastate values of the enterprise. Mobil Oil Corp. v. Com’r of Taxes of Vermont, 445 U.S. 425, 100 S.Ct. 1223, 63 L.Ed2& 510, (1980); Moorman Mfg. Co. v. Bair, 437 U.S. 267, *327 272-273, 98 S.Ct. 2340, 2343-2344, 57 L.Ed.2d 197 (1978); National Bellas Hess, Inc. v. Department of Revenue, 386 U.S. 753, 87 S.Ct. 1389, 18 L.Ed.M 505 (1967); Norfolk & Western R. Co. v. State Tax Comm’n, 390 U.S. 317, 88 S.Ct. 995, 19 L.Ed.M 1201 (1968).
Plaintiff does not challenge the validity of New Jersey’s taxing statute nor the calculation of the tax it has been required to pay. It recognizes that our Supreme Court has held that N.J.S.A. 54:10A-1 et seq. is a fairly apportioned, nondiscriminatory means of requiring foreign corporations to pay their just share of the costs of the state government upon which they rely and by which they are furnished protection and benefits. Roadway Express Inc. v. Div. Taxation Director, 50 N.J. 471, 236 A.2d 577 (1967), app. dism. 390 U.S. 745, 88 S.Ct. 1443, 20 L.Ed.2d 276 (1968). Additionally, plaintiff has not challenged the action of defendant on the basis that it would subject plaintiff to multiple taxation or the possibility of multiple taxation, in violation of the Commerce Clause of the Federal Constitution. The record is barren of any evidence in this regard.
It is the lack of nexus that plaintiff contests. In plaintiff’s view its activities within New Jersey are limited to mere solicitation of orders. A fortiori, plaintiff asserts, this minimal activity is immunized from taxation in New Jersey by virtue of P.L. 86-272, 73 Stat. 555, 15 U.S.C.A. §§ 381-384 (1970).[2]
P.L. 86-272 was enacted in 1959 to clarify questions arising as a result of Northwestern States Portland Cement Co. v. Minnesota, 358 U.S. 450, 79 S.Ct. 357, 3 L.Ed.2d 421 (1959); in which it was held that
... net income from the interstate operations of a foreign corporation may be subjected to state taxation provided the levy is not discriminatory and is properly apportioned to local activities within the taxing State forming a sufficient nexus to support the same, [at 452].
*328 Cognizant that this decision did not adequately specify what local activities were enough to create a “sufficient nexus” for the imposition of a tax, Congress, within seven months of Northwestern States Portland Cement, acted to establish a level of “minimum activities” below which a net income tax could not be imposed. S.Rep.No.658, 86th Cong. 1st Sess., 2, reprinted in [1959] U.S.Code Cong. & Admin.News 2548; Heublein v. South Carolina Tax Commission, 409 U.S. 275, 280, 93 S.Ct. 483, 487, 34 L.Ed.2d 472 (1972).
15 U.S.C.A. § 381 provides in relevant part as follows:
(a) No State, or political subdivision thereof, shall have power to impose, for any taxable year ending after September 14, 1959, a net income tax on the income derived within such State by any person from interstate commerce if the only business activities within such State by or on behalf of such person during such taxable year are either, or both, of the following:
(1) the solicitation of orders by such person, or his representative, in such State for sales of tangible personal property, which orders are sent outside the State for approval or rejection, and if approved, are filled by shipment or delivery from a point outside the State; and
(2) the solicitation of orders by such person, or his representative, in such State in the name of or for the benefit of a prospective customer of such person if orders by such customer to such person to enable such customer to fill orders resulting from such solicitation are orders described in paragraph (1).
(c) For purposes of subsection (a) of this section, a person shall not be considered to have engaged in business activities within a State during any taxable year merely by reason of sales in such State, or the solicitation of orders for sales in such State, of tangible personal property on behalf of such person or one or more independent contractors, or by reason of the maintenance of an office in such State by one or more independent contractors whose activities on behalf of such person in such State consist solely of making sales, or soliciting orders for sales of tangible personal property.
(d) For purposes of this section—
(1) the term ‘independent contractor’ means a commission agent, broker, or other independent contractor who is engaged in selling, or soliciting orders for the sale of tangible personal property for more than one principal who holds himself out as such in the regular course of his business activities; and,
(2) the term “representative” does not include an independent contractor. [Emphasis supplied]
In Clairol, Inc. v. Kingsley, supra, our Appellate Division had occasion to construe the scope of protection afforded by the federal statute. There it was held that Clairol, a Delaware corporation having its nationwide sales department in New *329 York, was not immune from taxation. Clairol had no formal office, no real estate, no telephone (salesmen had their own) and no bank accounts in New Jersey. All of Clairol’s New Jersey representatives were residents of this State. Their primary function was to promote the public’s purchase and use of Clairol products. Working from automobiles leased by the corporation, the representatives made regular visits to retail druggists and while there, reviewed displays, rotated stock of Clairol products, and took inventories. If an inventory disclosed a need for new stock, the representative would assist the druggist in writing the order. The representatives had no authority to accept orders. All orders had to be approved by Clairol’s credit manager in New York. Neither billing nor collection matters were handled by these representatives. Sometimes, however, representatives exerted pressure on a customer to pay. Complaints about the product would not be investigated by these representatives.
No employee of Clairol was required or encouraged to use his home or space in his home for business purposes, nor did Clairol reimburse any employee for any such use. Employees were reimbursed, however, for gasoline, postage and tolls, as well as for telephone calls made either from the road or from the employee’s home telephone.
The representatives received from Clairol display material and samples. These items were to be kept in their automobiles. It was Clairol’s policy to train each representative to do his paperwork in his car. The samples were to be given to cosmeticians who did a good job with Clairol products. Each lot of samples was valued at about $125.
One of Clairol’s subsidiaries, Clairol Technical Centers, Inc., sent out technicians who furnished technical advice to professional beauticians on the effect and proper use of Clairol products. This subsidiary paid its own separate New Jersey franchise tax. Clairol neither interchanged personnel nor shared the office space which belonged to its subsidiary.
Clairol sales in New Jersey were considerable. For 1964 sales were over $3,000,000. Sales for other years were also very substantial.
*330 Without deciding whether, without the technicians, Clairol’s activities went beyond solicitation, on the basis of the above-mentioned findings the Appellate Division concluded that, taken as a whole, Clairol’s activities in New Jersey exceeded solicitation. See, also, Glick Studies, Inc. v. Taxation Div. Director, 2 N.J.Tax 365 (Tax Ct. 1981), holding that the taking of photographs and accepting payments within New Jersey went far beyond the mere solicitation of orders.
Defendant points to the striking similarity of the activities in Clairol to the facts herein. While defendant concedes that Clairol’s New Jersey sales were substantially greater than those of Ringgold, it maintains that, nevertheless, Ringgold’s presence, activity and property in New Jersey during the assessment period were sufficient to bring it within the taxing ambit of the Corporation Business Tax Act.
The United States Supreme Court’s only opinion addressed to § 381 provides no guidance in ascertaining the validity of defendant’s contention. Heublein v. South Carolina Tax Comm’n, 409 U.S. 275, 93 S.Ct. 483, 34 L.Ed.2d 472 (1972). In Heubiein the taxpayer was required to maintain a local representative in the taxing state, pursuant to state liquor regulations. South Carolina law required that shipments of liquor into the state be first sent to the representative, who then transferred the shipments to a local wholesaler. The court did not have to decide whether the activities of Heublein’s representative, namely, maintaining an office in his home, distributing promotional literature and personally delivering orders, fell under the rubric of “solicitation.” In its view, the transfer of goods by Heublein’s representative in South Carolina to a local wholesaler constituted activity which went beyond mere solicitation and was therefore subject to tax.
With little uniformity, courts of other jurisdictions have attempted to assess the types of activities Congress sought to insulate from state tax. In reviewing the relevant decisions of other courts, the Supreme Court of Georgia observed that three inclusive definitions of activities constituting “solicitation” have *331 emerged from the deliberations of the courts of our sister states. See Chattanooga Glass Co. v. Strickland, 244 Ga. 603, 261 S.E.2d 599, 601 (1979). As perceived by the Georgia Supreme Court, solicitation has been defined alternatively as:
(1) the specific act of asking a customer to purchase one’s product;
(2) any act which leads to the purchase of one’s product as opposed to acts which
follow from the purchase;
(3) any act which leads to or follows from the purchase as long as said act is incidental to the purchase. [Emphasis supplied]
Citing Clairol, Inc. v. Kingsley, supra, the Supreme Court of Arkansas adopted the first definition. It held that the regular check of customers’ inventories by the taxpayer’s representative went “far beyond mere solicitation.” Hervey v. AMF Beaird, Inc., 250 Ark. 147, 464 S.W.2d 557, 562 (Sup.Ct.1971).
Two cases which share facts similar, but not identical, to the instant case illustrate application of the second and third definitions. Miles Laboratories, Inc. v. Dep’t of Revenue, 274 Or. 395, 546 P.2d 1081 (Sup.Ct.1976), and Indiana Dep’t of Revenue v. Kimberly-Clark Corp., 416 N.E.2d 1264 (Ind.Sup.Ct.1981).
Utilizing the second definition enunciated above, the Supreme Court of Oregon, in Miles Laboratories, Inc., held a corporation taxable when its in-state representatives arranged advertising displays and replaced damaged goods after sale. In the court’s view these activities were the type that “followed” the taking of orders. As such, they were in the same category as collections, servicing complaints, technical assistance and training — activities that were acknowledged to be beyond solicitation. See Olympia Brewing v. Dep’t. of Rev., 266 Or. 309, 511 P.2d 837 (Sup.Ct.1973), cert. den. 415 U.S. 976, 94 S.Ct. 1561, 39 L.Ed.2d 872 (1974).
The third definition was followed by the Supreme Court of Indiana in Indiana Dep’t of Revenue v. Kimberly-Clark, supra, and the Supreme Court of Pennsylvania in U. S. Tobacco Co. v. Commonwealth, 478 Pa. 125, 386 A.2d 471, 478 (1978).
Kimberly-Clark did not focus on pre-sale activities as distinguished from post-sale activities. The court was of the opinion that Congress perceived “solicitation” as “embodying sundry *332 activities so long as those activities were closely related to the eventual sale of a product.” Id. at 1268. As long as the activity could be deemed an “act of courtesy” done in order to accommodate a customer, the court reasoned that the taxpayer’s representative had not ventured beyond the realm of solicitation and hence plaintiff was exempt from taxation. In Kimberly-Clark the crucial activities were: (1) the conveying of information to customers concerning inventory conditions or delays in shipments; (2) the verification of the destruction of damaged merchandise and (3) the coordination of the delivery of merchandise for special promotions. It was held that these activities could be properly categorized as inextricably related to solicitation or acts of courtesy.
In United States Tobacco v. Commonwealth, supra, the Supreme Court of Pennsylvania held that a corporation is engaged in mere solicitation when its only activities within a taxing state consist of informing customers of new products, assisting in the display of -those products and taking orders. The court was of the opinion that Congress had intended in § 381 to include such activities within the concept of solicitation.
As can readily be seen, there is no talismanic formula, or at least this court has not discovered one, which will henceforth enable a court to decide “subjectivity to taxation” questions according to a fixed and well articulated criterion. In ascertaining whether the taxpayer’s activity is sufficient to enable the State to exact a tax recourse must be had to the specific factual circumstances involved in each case.
In this case, I find the critical factors to be:
(1) the presence in New Jersey of property belonging to Ringgold, namely, a succession of automobiles, an IBM typewriter, a file cabinet, stamps, business cards, stationery and a telephone registered in plaintiff’s name;
(2) maintenance of a place to work in Sherman’s home in New Jersey, which satisfied Sherman’s need for an informal office;
(3) the encouragement by Sherman of the payment of delinquent bills by Ringgold customers;
*333 (4) the handling of customer complaints and adjustments by Sherman;
(5) the supervision of Ringgold personnel by Sherman.
I conclude that these intrastate activities which took place during the tax years of 1962 to 1977 exceeded mere solicitation of orders. This is so under any one of the three definitions of solicitation and therefore it is unnecessary to decide which definition is correct, although Clairol v. Kingsley, supra, seems to indicate that any activity beyond the specific act of asking a customer to purchase one’s product (the first definition advanced above) transcends the bounds of mere solicitation.
Here, Ringgold’s vice-president, Sherman, operated within this State during the period of November 1962 to June 1977 and made possible the realization and continuation of valuable contractual relationships between Ringgold and its customers. This State had therefore given something for which it can exact a return.
Although it may logically be argued that each of Ringgold’s activities taken individually may not warrant the conclusion that plaintiff exceeded the minimum threshold established by § 381, collectively, plaintiff’s activities demonstrate taxable presence.
While plaintiff’s activities in New Jersey may not be as concentrated and far reaching as those in Clairol, I find a sufficient connection or relationship to conclude that New Jersey afforded protection and benefits to plaintiff to sustain defendant’s tax exaction.
I am not persuaded to a contrary result by the New Jersey cases cited by plaintiff in support of its argument that it does not “maintain an office” in New Jersey. I find that Hoeganaes Corp. v. Taxation Div. Director, 145 N.J.Super. 352, 367 A.2d 1182 (App.Div.1976), the principal case relied on by plaintiff, in no way affects the disposition of this matter. As pointed out by defendant, although the facts of Hoeganaes are admittedly similar to the case at bar, Hoeganaes is clearly distinguishable. There, the sole issue was whether plaintiff maintained a “regu *334 lar place of business” outside of this State for purposes of allocating income away from New Jersey. N.J.S.A. 54:10A-6. Here, the issue is whether plaintiff is subject to taxation for the tax years in question because it (1) had exercised' its corporate franchise, or (2) did business, or (3) employed or owned capital or property, or (4) maintained an office in New Jersey. N.J.S.A. 54:10A-2. Even assuming, arguendo, that I were to find that the bedroom equipped with office furniture does not establish “maintenance of an office,” for apportionment purposes plaintiff could still be subject to taxation under one or more of the other enumerated statutory predicates for taxation.
Similarly, the other three cases cited by Ringgold, Materials Research Corp. v. Metron, 64 N.J. 74, 312 A.2d 147 (1973); U. S. Time Corp. v. Grand Union Co., 64 N.J.Super. 39, 165 A.2d 310 (Ch.Div.1960), and Eli Lilly & Co. v. Sav-On Drugs, Inc., 57 N.J.Super. 291, 154 A.2d 650 (Ch.Div.1959), aff’d 31 N.J. 591,158 A.2d 528 (1960), aff’d 366 U.S. 276, 81 S.Ct. 1316, 6 L.Ed.2d 288 (1961), are of no assistance to a determination of the issue herein. This line of cases involved a New Jersey statute which denies a foreign corporation transacting business in this State access to New Jersey courts if such corporation fails to obtain a certificate of authority to transact such business in this State. The issue was whether the application of the foreign corporation qualification provision of New Jersey’s statute to the foreign corporation unconstitutionally burdened interstate commerce. Each case required an analysis of whether one of the parties was transacting business in this State. A resolution of the qualification requirement of transacting business is not determinative of the issue of whether this State had jurisdiction to tax under N.J.S.A. 54:10A-2. See, also, N.J.A.C. 18:7-1.6 and 1.8.
Based on ¡the foregoing, I conclude that plaintiff was subject to taxation by New Jersey pursuant to the Corporation Business Tax Act for the period 1962 to 1976. There is no evidence that plaintiff engaged in any taxable activity in this State during the year 1961 other than solicitation of orders. Ringgold’s vice-president Sherman did not engage in the activities cited above in New Jersey on behalf of plaintiff until November 1962.
*335 Therefore, plaintiff’s application for refund of taxes for 1961, along with an abatement of interest and penalty for such year, is granted. Plaintiff’s application for a refund of taxes and abatement of interest and penalty for the tax years of 1962 through 1976, inclusive, is denied. The Clerk of the Tax Court is directed to enter judgment reversing the determination of the Director of the Division of Taxation for 1961 and affirming his determinations for the tax years of 1962 through 1976.

The record consists of documentary exhibits, legal briefs, a trial transcript and the deposition of Sherman. The parties agreed that Sherman’s deposition should be admitted in evidence because of his death before the trial of this matter.

This act only applies to taxes on or measured by net income. It does not exempt that portion of the tax based on net worth. See Clairol v. Kingsley, 109 N.J.Super. 22, 28, 262 A.2d 213 (App.Div.1970), aff’d 57 N.J. 199, 270 A.2d 702 (1970), app. dism. 402 U.S. 902, 91 S.Ct. 1377, 28 L.Ed.2d 643 (1971).