[No. C036307. Third Dist. Dec. 31, 2001.]

THE READER'S DIGEST ASSOCIATION, INC., Plaintiff and Appellant,
v.
FRANCHISE TAX BOARD, Defendant and Respondent.

## COUNSEL

Brann & Isaacson, George S. Isaacson, Martin I. Eisenstein, Peter J. Brann; Somach, Simmons & Dunn and John A. Mendez for Plaintiff and Appellant.

Bill Lockyer, Attorney General, Lawrence K. Keethe, Steven Green and Norman J. Scott, Deputy Attorneys General, for Defendant and Respondent.

## OPINION

**DAVIS, Acting P. J.**—In this action for a refund of franchise taxes, The Reader's Digest Association, Inc. (RDA), appeals from a judgment in favor of the California tax authorities. Federal law exempts an out-of-state company from income-based state taxation if that company merely sells or

solicits sales through an in-state independent contractor.[1] The pivotal issue here is whether a wholly owned subsidiary of RDA, Reader's Digest Sales & Services, Inc. (RDS&S), which sold and solicited sales of advertising pages for RDA, was such a contractor. We agree with the trial court that RDS&S was not and affirm.

## DISCUSSION

This case involves the context of state income taxation of an out-of-state company engaged in interstate commerce in the taxing state.

In the 1959 decision *Portland Cement Co. v. Minnesota*, the United States Supreme Court concluded that the net income of an out-of-state company derived from interstate commerce activities within the taxing state "may be subjected to state taxation provided the levy is not discriminatory and is properly apportioned to local activities within the taxing State forming sufficient nexus to support the same."[2]

To clarify this *Northwestern* standard and to allay fear that "mere solicitation" of sales would subject out-of-state companies to state taxation, Congress enacted section 381 in the latter part of 1959.[3]

Section 381 has remained untouched since its inception and provides as relevant:

### "(a) Minimum standards

"No State, or political subdivision thereof, shall have power to impose . . . a net income tax on the income derived within such State by any person from interstate commerce if the only business activities within such State by or on behalf of such person during such taxable year are . . . :

"(1) the solicitation of orders by such person, or his representative, in such State for sales of tangible personal property, which orders are sent outside the State for approval or rejection, and, if approved, are filled by shipment or delivery from a point outside the State . . . [¶] . . . [¶]

### "(c) Sales or solicitation of orders for sales by independent contractors

[1] Title 15 United States Code section 381 (Pub.L. No. 86-272 (Sept. 14, 1959) tit. I, § 101, 73 Stat. 555) (section 381).

[2] *Portland Cement Co. v. Minn.* (1959) 358 U.S. 450, 452 [79 S.Ct. 357, 359, 3 L.Ed.2d 421, 67 A.L.R.2d 1292] (*Northwestern*).

[3] *Heublein, Inc. v. South Carolina Tax Comm'n* (1972) 409 U.S. 275, 279-280 [93 S.Ct. 483, 487, 34 L.Ed.2d 472].

"For purposes of subsection (a) of this section, a person shall not be considered to have engaged in business activities within a State during any taxable year merely by reason of sales in such State, or the solicitation of orders for sales in such State, of tangible personal property on behalf of such person by one or more independent contractors, or by reason of the maintenance, of an office in such State by one or more independent contractors whose activities on behalf of such person in such State consist solely of making sales, or soliciting orders for sales, of tangible personal property.

"**(d) Definitions**

"For purposes of this section—

"(1) the term 'independent contractor' means a commission agent, broker, or other independent contractor who is engaged in selling, or soliciting orders for the sale of, tangible personal property for more than one principal and who holds himself out as such in the regular course of his business activities; and

"(2) the term 'representative' does not include an independent contractor."

California imposes a franchise tax on companies, ascertained by net income, for the privilege of doing business within the state.[4] This appeal involves franchise taxes RDA paid for the tax years 1986, 1987 and 1988 in the respective approximate amounts (including interest and penalties) of $102,000, $764,000, and $1.02 million, pursuant to unitary group tax returns that included RDS&S in RDA's unitary group. The unitary method of taxing an interstate business treats several elements of the business as one unit for tax purposes, with the business filing a unitary group tax return.[5]

RDA does not challenge the facts as found by the trial court in the bench trial below. Indeed, RDA argues those facts compel the conclusion that RDS&S sold and solicited sales of advertising pages—for RDA, for RDA's subsidiaries, and for certain non-RDA foreign companies publishing various editions of Reader's Digest—as an independent contractor under the plain

---

[4]Revenue and Taxation Code sections 23101-23114, 23151; see also Revenue and Taxation Code sections 23501-23504.

[5]See *Rain Bird Sprinkler Mfg. Corp. v. Franchise Tax Bd.* (1991) 229 Cal.App.3d 784, 787-788 [280 Cal.Rptr. 362].

language of section 381(d)(1), thereby exempting RDA from California's franchise tax.

The trial court found the following pertinent facts.

RDA is a Delaware corporation headquartered in Pleasantville, New York. It publishes and sells Reader's Digest. All orders for RDA's products are accepted or rejected outside California and, if accepted, are sent from outside California. RDA does not own, lease or maintain any facilities or bank accounts in California, and has no California employees. Corporate subsidiaries of RDA publish editions of Reader's Digest, as do several foreign companies not owned by RDA, which publish pursuant to licensing agreements with RDA. The pertinent California tax authority—the Franchise Tax Board (FTB)—concedes that, on these facts, RDA is not subject to California income-based taxation in light of section 381.

RDS&S is a wholly owned subsidiary of RDA. It is separately incorporated in Delaware and, during the tax years at issue, was headquartered in New York, New York. RDS&S had its own board of directors, although there was some overlap with the RDA board membership; the trial court also noted, "[o]fficers and directors of RDS&S were also officers and directors of RDA."

During the tax years at issue, RDS&S solicited sales of advertising pages in domestic and foreign editions of Reader's Digest. RDS&S solicited advertising page sales for RDA as well as for RDA subsidiaries that published editions of Reader's Digest. RDS&S also solicited such sales for at least four of the foreign companies (in which RDA had no ownership interest) that published foreign language editions of Reader's Digest. The parties agree that RDS&S was engaged in selling, or soliciting orders for the sale of, tangible personal property within the meaning of section 381: advertising pages in various editions of Reader's Digest.

During the tax years at issue, RDS&S maintained two offices in California, with less than 10 employees. RDS&S sold advertising pages on RDA's behalf pursuant to a contract with RDA. RDS&S had authority to enter into contracts with advertisers subject to the approval of the publisher of the respective edition of Reader's Digest.

RDS&S was the only entity that sold or solicited the sale of advertising pages in the United States for any edition of Reader's Digest. RDA required all subsidiaries and foreign companies publishing editions of the magazine to

use RDS&S as their advertising "broker" in the United States. There was no evidence that RDS&S solicited sales of advertising pages on behalf of any publication other than various editions of Reader's Digest.

RDA was involved in reviewing and executing RDS&S's leases for premises in California, and RDA administratively oversaw properties of RDA subsidiaries (presumably including RDS&S). RDA performed many accounting functions, administered the employee benefit plans, and purchased all insurance, including premises liability insurance, on RDS&S's behalf. In discussing the move of RDS&S's offices and employees from one building in New York City to another, an entry in RDA's board minutes in June 1988 stated that "a sublease for *our* Pan Am thirty-second floor space has been executed and *our employees* will move to 261 Madison Avenue." (Italics added.) These minutes add that *RDA* expected to save over $15 million from the move.

RDA filed unitary group tax returns for the tax years in question and included RDS&S within that group. RDA's consolidated financial statements during those years eliminated as "intercompany" RDS&S's entire net sales and operating revenue. Citing trial testimony, the trial court noted that "intercompany transactions" are eliminated to accurately reflect the economic activity of a company or a group of companies as compared to those outside the company. As RDA's vice-president of tax testified, in explaining this aspect of RDA's financial statements, "[y]ou can't generate income by selling between yourself for U.S. financial purposes."

That covers the unchallenged facts as found by the trial court.

■ The issue is whether RDS&S, during the tax years in question, was a section 381(d)(1) independent contractor—making RDA exempt from California income-based taxation (see § 381(c)); or whether RDA was, in actuality, doing business in California through RDS&S—making RDA subject to such taxation.

We must construe section 381(d)(1) in light of the undisputed facts set forth above. This presents a question of law for our independent consideration.[6]

Section 381(d)(1) defines the term "independent contractor" for purposes of section 381 to mean "a commission agent, broker, or other independent

---

[6]*State Farm Mut. Auto. Ins. Co. v. Messinger* (1991) 232 Cal.App.3d 508, 513 [283 Cal.Rptr. 493]; *Rudd v. California Casualty Gen. Ins. Co.* (1990) 219 Cal.App.3d 948, 951 [268 Cal.Rptr. 624].

contractor who is engaged in selling, or soliciting orders for the sale of, tangible personal property for more than one principal and who holds himself out as such in the regular course of his business activities."

Section 381(d)(1)'s definition ultimately asks whether the alleged independent contractor is doing business for itself or for the out-of-state company.[7] If the alleged independent contractor represents other principals in a similar sales capacity and holds itself out as an independent contractor in the normal course of its business, as required by the section 381(d)(1) definition, it is transacting business for itself and can be considered an independent contractor.[8]

Section 381(d)(1), then, defines an independent contractor as an entity that is engaged in an independent, commercially based business that charges others to make or solicit sales, and that holds itself out as such in the regular course of its business activities. None of these attributes applied to RDS&S during the tax years at issue.

RDS&S was not an independent business that held itself out as an independent contractor, but an integral part of RDA's business. RDS&S sold advertising pages for RDA's Reader's Digest publishing enterprise. This sales activity was an integral part of that enterprise. RDA oversaw RDS&S's property, accounting, insurance, and employee benefits, and included RDS&S within its unitary group tax returns. RDA thought of RDS&S's offices, employees, and cost savings as *its* offices, *its* employees, and *its* cost savings.

RDS&S was not a commercially based business charging others for its sales services. Its entire net sales and operating revenue were eliminated on RDA's financial statements as being "intercompany" (i.e., within the RDA realm). As one of RDA's top tax officials testified, "[y]ou can't generate income by selling between yourself for U.S. financial purposes." This indicates that RDS&S's advertising sales were considered an integral part of RDA's business, rather than an outside transaction with a commercially distinct business.

Nor did RDS&S hold itself out, in the regular course of its business activities, as being available to represent others regarding sales. RDS&S was a wholly owned subsidiary of RDA, and worked only for RDA. RDS&S was

---

[7]See Sweeney, *State Taxation of Interstate Commerce Under Public Law 86-272: "A Riddle Wrapped in an Enigma Inside a Mystery"* 1984 BYU L.Rev. 169, 189, note 95 (Sweeney, *State Taxation*).

[8]Sweeney, *State Taxation*, 1984 BYU L.Rev., *supra*, page 189, note 95.

the only entity that solicited or sold advertising pages in the United States for any edition of Reader's Digest. RDA points to the non-RDA foreign companies and to the RDA subsidiaries that published various editions of Reader's Digest, and notes that RDS&S handled their advertising page sales. But the foreign companies, as the trial court found, had licensing agreements with RDA governing their publishing, and the RDA subsidiaries were, well, *RDA subsidiaries* publishing Reader's Digest; most significantly, RDA *required all* of these companies to use RDS&S as their advertising "broker" in the United States. In this respect, RDS&S was not holding itself out as an independent business; rather, it was RDA doing the holding and in its palm was RDS&S. While we in no way suggest that RDS&S was an alter ego—an issue not presented to us—this further illustrates RDA's control of RDS&S that precluded RDS&S from being an independent contractor within the meaning of section 381(d)(1).

As noted, the ultimate question asked by the section 381(d)(1) definition is whether the alleged independent contractor is doing business for itself or for the out-of-state company. In light of the undisputed facts here, it is clear that RDS&S was not doing business for itself but for the out-of-state company, RDA.

Section 381(d)(1) has drawn little judicial attention. The state Supreme Courts of Oregon and Minnesota found the definition ambiguous and applied their respective state definitions of independent contractor, emphasizing the factor of the right to exercise control over the entity at issue.[9] The undisputed facts outlined above show that RDA had a right to exercise control over RDS&S; RDS&S was therefore not an independent contractor under this approach.

One commentator has suggested a functional or activities approach more tied to the section 381(d)(1) language; this approach examines how the alleged independent contractor engaged in the sales activities as a business and how it held itself out to others.[10] This is similar to the approach we have taken, which likewise focuses on the section 381(d)(1) language.

RDA agrees that the proper approach is to focus on what it calls the plain language of section 381(d)(1). RDA does so by claiming that section 381(d)(1) "contains two requirements to be an independent contractor: (1) *one* must be engaged in selling or soliciting orders for the sale of tangible

---

[9]*Herff Jones Co. v. State Tax Commission* (1967) 247 Or. 404, 409 [430 P.2d 998, 1000]; *Tonka Corp. v. Commissioner of Taxation* (1969) 284 Minn. 185, 191-193 [169 N.W.2d 589, 593-595].

[10]Sweeney, *State Taxation*, 1984 BYU L.Rev., *supra*, pages 188-191.

personal property for more than one principal; and (2) *one* must hold *oneself* out as such in the regular course of business." (Italics added.) RDA maintains that RDS&S met these two requirements because RDS&S engaged in this sales activity not just for RDA, but for RDA subsidiaries and nonowned (but RDA-licensed) foreign companies that published various editions of Reader's Digest.

The problem is that RDA's interpretation of section 381(d)(1), through its artful use of the pronoun "one," neglects the section's critical opening language that "the term 'independent contractor' *means a commission agent, broker, or other independent contractor* who is engaged . . . and who holds himself out . . . ." (Italics added.) RDA's interpretation cuts the heart out of the section 381(d)(1) definition: an independent, commercially based business that holds itself out as such in the regular course of its business.

Because RDS&S is not an independent contractor within the definition of section 381(d)(1), we conclude that RDA is not exempt from taxation under section 381(c) for the tax years at issue.

RDA raises a second contention that has been mooted by our resolution of its first contention. RDA contends that if it is exempt from taxation under section 381, California is then also precluded from *indirectly* taxing RDA's income based on the retroactive application of an inaccurate administrative standard that has been overruled. This issue has to do with whether RDA's California sales are to be included in one part of the unitary group tax formula, even though RDA itself was not taxable by California. The original administrative standard—the so-called *Joyce* rule—said no (*Appeal of Joyce, Inc.* (Nov. 23, 1966, Cal. St. Bd. Eq.) 1966 WL 1411). The *Joyce* standard was then overruled by another administrative decision known as *Finnigan II* (which RDA contends is the inaccurate standard here). (*Appeal of Finnigan Corp.* (Jan. 24, 1990) 88-SBE-022-A, 1990 WL 15164.) *Finnigan II* was then itself overturned (*Appeal of Huffy Corp.* (Apr. 22, 1999) 99-SBE-005, 1999 WL 386938), and *Joyce* once again became the standard. All of this is academic, however, because it is premised on the assumption that California cannot impose an income-based tax on RDA itself; California can.

### DISPOSITION

The judgment is affirmed.

Nicholson, J., and Kolkey, J., concurred.

Appellant's petition for review by the Supreme Court was denied March 13, 2002.