NOT FOR PUBLICATION WITHOUT APPROVAL OF
THE TAX COURT COMMITTEE ON OPINIONS

# TAX COURT OF NEW JERSEY



**KATHI F. FIAMINGO**
JUDGE

**120 High Street**
**Mount Holly, NJ 08060**
**(609) 288-9500 EXT 38303**

May 25, 2021

Via eCourts
Michael J. Duffy
Deputy Attorney General

Via eCourts
Marc A. Simonetti, Esq.
Pillsbury Winthrop Shaw Pittman LLP

> Re: Procacci Brothers Sales Corporation v. Director, Division of Taxation
> Docket Nos. 015626-2014

Dear Counsel:

This letter constitutes the court's opinion after trial of the issues in the within matter. At issue is the imposition of the New Jersey Corporation Business Tax ("CBT") for the tax years 2002 through 2008. Plaintiff contends that it is exempt from the imposition of CBT by virtue of the application of 15 U.S.C. § 381, more commonly known as Public Law 86-272 ("P.L. 86-272"), which prohibits the imposition of a state tax on income on a corporation engaged in interstate commerce which has limited in-state business activities. For the reasons as more particularly set forth below the court finds that under the circumstances presented here, plaintiff's conduct of accepting product returned to it prior to acceptance by the customer is ancillary to its solicitation of sales and thus protected activity pursuant to P.L. 86-272. Plaintiff's conduct in sending its trucks into the State for the purpose of accepting returns of accepted produce is not protected conduct however under the facts presented here, that conduct was de minimis and the court finds that with the exception of the tax year ending January 2007, such conduct was insufficient to






*

warrant imposition of the CBT. As to the tax year ending January 2007, plaintiff's conduct of occasionally sending trucks into the State to obtain produce from a related entity and delivering such produce to its warehouse facility in Pennsylvania, together with the systematic conduct of sending its trucks for the purpose of picking up produce rejected after delivery, constitutes sufficient contacts to conclude that plaintiff conducted business in the State of New Jersey, subjecting it to tax in this state.

Thus, to the extent of the tax imposed for the year ending January 2007, the court affirms the Director's final determination. The tax imposed for the other years under audit is rejected. The court upholds the imposition of the penalties and interest imposed for tax year ending January 2007.

**FACTS AND PROCEDURAL HISTORY**

A. *Procedural History*

On January 11, 2006, the Division of Taxation (the "Division") conducted a truck stop of a driver for Procacci Brother Sales Corporation ("plaintiff"). As a result of the stop a warrant of jeopardy assessment was issued for failure to file N.J. Corporation Business Tax ("CBT") returns. Plaintiff filed a protest of the jeopardy assessment with the Division's conference and appeals branch. While the protest was pending, plaintiff sought relief under the 2009 amnesty program and filed CBT returns for years 2002 through 2008. The Division reviewed the CBT returns and on March 11, 2013, a notice of assessment related to final audit determination ("assessment") was issued which plaintiff protested. A final determination dated August 20, 2014 was issued, assessing CBT, interest and penalties totaling $1,444,374.48 for the period of 2002 through 2008 ("final determination").

2

On November 18, 2014, plaintiff filed a complaint with the Tax Court, appealing the final determination. Plaintiff filed a motion for partial summary judgment which the court denied on August 30, 2017. Trial on the issues in this matter was then heard on three non-consecutive dates. Immediately prior to trial, plaintiff filed an in limine motion to exclude certain witness testimony and documents by the Director of the Division of Taxation ("Director" or "defendant"). The court denied the motion, finding that the proposed witnesses were in rebuttal of plaintiff's positions asserted in a deposition taken shortly before the start of trial. The court permitted plaintiff and defendant an opportunity to depose the proposed witness and examine the documents prior to the next scheduled date for testimony.

B. *Findings of Fact*

1. Plaintiff's business

The court makes the following findings of fact based on the testimony and evidence presented. Plaintiff is a wholesale produce distributor which purchases and sells fresh fruits and vegetables. During the years under review it was a family-owned business which had been in operation since 1948. Plaintiff purchases and distributes produce to large chain supermarkets (like Wakefern, Grand Union and Giant), and other smaller grocery stores, and food service entities (like Subway and Burger King). As a wholesaler plaintiff does not sell its product directly to consumers, but instead sells its product to its customers which thereafter sell it at their retail locations.

During the period under review plaintiff did not maintain any office locations in the State of New Jersey; owned no real property in New Jersey; and maintained no inventory in the State. Plaintiff did service customers within the State of New Jersey receiving orders at its Pennsylvania headquarters where those orders were processed. The orders were fulfilled at plaintiff's

3

Philadelphia warehouse and shipped to customers some of whom were located in New Jersey. Testimony revealed that although the majority of the produce was delivered by third party carrier trucks, during fiscal years 2004 through 2007 plaintiff also shipped into New Jersey on plaintiff's own trucks.

| | Fiscal year 2004 | Fiscal Year 2005 | Fiscal Year 2006 | Fiscal Year 2007 |
|---|---|---|---|---|
| Total Packages[1] shipped into NJ | 4,254,021 | 3,815,518 | 3,489,570 | 3,644,138 |
| Packages shipped on plaintiff's trucks | 475,745 | 476,119 | 483,499 | 415,889 |
| Percentage shipped on plaintiff's trucks | 11.183 | 12.48 | 13.86 | 11.41 |

2. The Vineland Produce Auction

The Vineland Produce Auction has a long history in the State of New Jersey. During the audit period it was comprised of approximately 82 farmers who took their produce to market during each growing season. Particularly important to the produce industry is the "gap period" from approximately May to the beginning of July when New Jersey provides most of the produce grown in the area.[2]

On the other side of the auction are the buyers, consisting of cash buyers and buyers licensed by the New Jersey Department of Agriculture to purchase product on credit.[3] During the

---

[1] "Package" is an industry term which refers how to a particular item of produce is boxed. For example, a package of corn is approximately 4 and ½ dozen; a package of peppers is approximately 28 pounds; and a package of cabbage is 50 pounds.
[2] According to the testimony provided neither Maryland nor New York have marketable product during the gap period.
[3] A person engaging in or carrying on the business of purchasing any agricultural commodity in this State must obtain a license from the N.J. Department of Agriculture. N.J.S.A. 4:11-18. The applicant must satisfy the Secretary of the Department of Agriculture as to "character, financial responsibility and good faith." N.J.S.A. 4:11-19.

so-called gap period, the Vineland Auction set the market (price) for produce sold in every available market. The Vineland Auction is unique in that it remains the only remaining produce auction in the United States, although the manner in which sales are conducted are substantially different.

The Director presented evidence from plaintiff's director of sales during the audit period. The Director attempted to demonstrate that the plaintiff's activities exceeded mere solicitation of sales by locating a purchasing agent in the State of New Jersey. Although the witness testified that it was his belief that plaintiff had a buyer at the Vineland Auction during the audit period, he learned "definitely" that there was no license for plaintiff to purchase on the Vinland Auction until sometime after 2007, after the end of the audit period. That testimony was corroborated by a representative of the Vineland Auction, also produced by the defendant. The only reliable evidence at trial confirmed that plaintiff had no license to purchase on the Vineland Auction until sometime after the audit period.

The Director's witness further testified that he learned that although plaintiff did not have a seat at the Vineland Auction, plaintiff's representative during the audit period would purchase produce from a buyer with a seat at the auction. Although the witness testified that he believed plaintiff's representative had an office in New Jersey, he was equivocal on the issue and unable to testify with any direct knowledge as to this important factual issue.

The witness testified that the Vineland Auction "set the price" for produce sold during the all-important gap period. The Auction acted like a "stock market" in terms of the pricing of produce during this period of time, setting the price of produce for every available market. The prices set at the Vineland Auction were hand-written on price list. Buyers at the auction were subject to strict limitations on the dissemination of the price list with rather rudimentary

precautions put in place to limit access. The actual price lists prepared at the auction could not be delivered to individuals outside of the auction. The witness testified that plaintiff's employee would provide the sales team with the prices established at the auction in order to sell to their clients. Although the witness testified that he believed an employee of plaintiff was stationed in New Jersey and relayed the pries set at the auction to the sales team in Pennsylvania, he had no direct knowledge of where the employee was when he obtained the prices, or from whom or how he obtained them. The testimony, while credible, was not reliable evidence that the referenced employee was located in New Jersey when the pricing information was provided. The witness was unable to testify with any certainty whether the employee obtained the pricing data telephonically from someone located in New Jersey, or whether the employee was actually in New Jersey at the time. The testimony did not establish that plaintiff held a seat at the Vineland Auction during the years under review or that any employee of plaintiff was stationed in New Jersey for the purpose of obtaining pricing information, or for any other purpose.

### 3. Ag-Mart Produce,Inc.

Credible testimony was provided that an entity related to plaintiff, Ag-Mart Produce, Inc d/b/a Santa Sweets, Inc. ("Ag-Mart") grew tomatoes and other produce within New Jersey and that plaintiff purchased produce from the related entity. Uncontradicted testimony was provided that at least through 2004, plaintiff utilized third party carriers to pick up Ag-Mart produce in New Jersey and deliver it to plaintiff at its facilities in Pennsylvania. In its interrogatory answers plaintiff indicated that "[f]rom 2005 through December 31, 2006, an employee leasing arrangement was utilized where [p]laintiff's drivers would deliver Ag-Mart Produce Inc.'s products to [p]laintiff's warehouse in Philadelphia." At trial, plaintiff's representative testified that third-party carriers were used to deliver Ag-Mart produce to plaintiff "at least through 2006"

6

thus contradicting the answers to interrogatories. The witness then testified that there was a "falling out" with the third-party carrier at the end of December 2005, and that in 2006 only "in a pinch" would plaintiff send one of its trucks to Ag-Mart's New Jersey farm to pick up product and deliver it to plaintiff's Pennsylvania facility. The court finds that the credible evidence provided demonstrates that during the tax year ending January 2007, plaintiff utilized its trucks on a systematic basis to pick up produce from Ag-Mart, located in New Jersey, and delivered it to its facility in Pennsylvania.

4. Perishable Agricultural Commodities Act of 1930

As a wholesaler of produce plaintiff was subject to the provisions of the Perishable Agricultural Commodities Act of 1930, 7 U.S.C. §§ 499a to 499t ("PACA"). PACA requires a wholesaler to accept the return of rejected produce within a reasonable time, not to exceed 24 hours of delivery. Thus, according to plaintiff's witnesses, rejection of produce might occur at the time of delivery, or at any time within the 24-hour period thereafter. If rejected at delivery, produce was returned on the truck which delivered it to the customer.

The total number of packages delivered into New Jersey which were rejected upon delivery, and returned to plaintiff is as follows:

|  | Fiscal year 2004 | Fiscal Year 2005 | Fiscal Year 2006 | Fiscal Year 2007 |
|---|---|---|---|---|
| Total Packages delivered to NJ | 4,254,021 | 3,815,518 | 3,489,570 | 3,644,138 |
| Packages rejected | 128,928 | 131,335 | 127,315 | 176,876 |
| Percentage of total packages rejected | 3.03 | 3.44 | 3.65 | 4.854 |
| Packages delivered and returned on plaintiff's trucks | 28,762 | 25,155 | 37,709 | 37,610 |
| Percentage of packages returned on plaintiff's trucks | 0.676 | 0.659 | 1.08 | 1.032 |

5. <u>Delivery of produce on pallets</u>

During the period in question plaintiff delivered its produce on pallets. To a great extent those pallets were provided by a third party, CHEP, USA ("CHEP") which were preferred in the industry for produce delivery. Plaintiff and CHEP entered into an agreement whereby CHEP would provide the preferred pallets for use by plaintiff. Although plaintiff would deliver its product on the CHEP pallets, ownership of the pallets remained with CHEP and would be delivered only to customers which had agreements with CHEP for its retrieval of its pallets. Thus, although produce was delivered to a customer on a CHEP pallet, that pallet remained the property of CHEP and once the pallet was delivered to the customer, plaintiff no longer retained any responsibility for its return to CHEP.

To a much lesser extent, plaintiff also utilized "brown wood" or "brown" pallets, upon which produce would be delivered to customers which did not participate in the CHEP program. Plaintiff did not track any inventory of brown pallets, deeming them to be of insufficient value.

However, if plaintiff delivered produce on brown pallets to a customer, it would obtain an equal number of brown pallets from that customer to be returned to its warehouse.

Plaintiff's representative testified that although the brown pallet upon which it delivered produce to a non-CHEP participating customer was at some point its property, the exchange of one brown pallet for another meant that the pallet remaining with the customer was not plaintiff's property but became the property of the customer. According to the uncontroverted testimony of plaintiff's representative, there was always an equal exchange of one brown pallet for another.

**LEGAL ANALYSIS**

A.      *Presumption of Correctness*

"[T]ax assessments are presumed correct, and the taxpayer has the burden of proving otherwise." Campo Jersey, Inc. v. Director, Div. of Taxation, 390 N.J. Super. 366, 383 (App. Div.), certif. denied, 190 N.J. 395 (2007). "New Jersey Courts generally defer to the interpretation that an agency gives to a statute [when] that agency is charged with enforc[ement.]" Koch v. Director, Div. of Taxation, 157 N.J. 1, 8 (1999). Determinations by the Director are afforded a presumption of correctness because "[c]ourts have recognized the Director's expertise in the highly specialized and technical area of taxation." Aetna Burglar & Fire Alarm Co. v. Director, Div. of Taxation, 16 N.J. Tax 584, 589 (Tax 1997) (citing Metromedia, Inc. v. Director, Div. of Taxation, 97 N.J. 313, 327 (1984). The Supreme Court has directed courts to accord "great respect" to the Director's application of tax statutes, "so long as it is not plainly unreasonable." Metromedia, 97 N.J. at 327. Nonetheless, "courts remain the final authority with respect to statutory construction and have no obligation to summarily approve of the Director's administrative interpretations." Gray v. Director, Div. of Taxation, 28 N.J. Tax 28, 35 (Tax 2014).

9

Plaintiff argues that while the Director's Final Determination relied on two theories for the inapplicability of P.L. 86-272 to plaintiff's activities, the Director advanced additional theories during the trial as to which, plaintiff asserts, no presumption of correctness attaches and which, further, the Director bears the burden of proof by the preponderance of the evidence. However,

> even if the Director is offering an alternative theory from that set forth in its [f]inal [d]etermination, the Tax Court has held that the Director is not required to state all possible grounds and theories to support he assessment, and should not be precluded from developing any defensive theory to justify the tax, provided he meets due process requirements and acts within the statutory time period. . . . Moreover, . . . the taxpayer is not prejudiced by permitting the Director to articulate an alternative theory than that set forth in the [f]inal [d]etermination since the Tax court reviews proceedings *de novo*.
>
> [Weintraub v. Dir., Div. of Taxation, 19 N.J. Tax 65, 83-84 (Tax 2000)(Internal citations omitted).]

[W]hether the presumption of validity has been overcome should be determined only once, either at the close of the plaintiff's proofs in the context of a R. 4:37-2(b)(2) motion, or at the conclusion of the trial. MSGW Real Estate Fund, LLC v. Mountain Lakes Borough, 18 N.J. Tax 364, 380 (1998). R. 4:37-2(b) permits a defendant to move to dismiss the action after the completion of the presentation of plaintiff's evidence. Here no such motion was made. Instead, plaintiff moved at the end of its own case for judgment under R. 4:40, before the Director had submitted its defense and other proofs, which the court denied.[4]

B.      *Taxation of income of foreign corporations*

N.J.S.A. 54:10A-2 provides,

> Every domestic or foreign corporation which is not hereinafter exempted shall pay an annual franchise tax for each year … for the privilege of having or exercising its corporate franchise in this State,

---

[4] R. 4:40-1 permits a motion for judgment "either at the close of all the evidence, or at the close of the evidence offered by an opponent."

or for the privilege of deriving receipts from sources within this State, or for the privilege of engaging in contacts within this State, or for the privilege of doing business, employing or owning capital or property, or maintaining an office, in this State.

However, the United States Constitution limits the State to tax out-of-state corporations' net income except to the extent that income is fairly allocable to the State. Complete Auto Transit, Inc. v. Brady, 430 U.S. 274, 279 (1977). In recognition of the constitutional limitation, the regulations interpreting the New Jersey Corporation Business Tax, ("CBT") circumscribe the situations in which foreign corporations are to file a CBT return and pay a tax thereunder, to those where the foreign corporation is "doing business" in the State. N.J.A.C. 18:7-1.6(a).

The determination of whether a foreign corporation is doing business in the state is fact sensitive. N.J.A.C. 18:7-1.9(b). Consideration is given to:

1. The nature and extent of the activities of the corporation in New Jersey;
2. The location of its offices and other places of business;
3. The continuity, frequency, and regularity of the activities of the corporation in New Jersey;
4. The employment in New Jersey of agents, officers, and employees; and
5. The location of the actual seat of management or control of the corporation.

[Ibid.]

C. *P.L. 86-272*

Plaintiff argues that its activities in New Jersey are exempt from taxation as a result of P.L. 86-272 which provides,

No state … shall have power to impose … a net income tax on the income derived within such State by any person from interstate commerce if the only business activities within such State by or on behalf of such person during such taxable year are either, or both, of the following:

11

(1) the solicitation of orders by such person, or his representative, in such State for sales of tangible personal property, which orders are sent outside the State for approval or rejection, and, if approved, are filled by shipment or delivery from a point outside the State; and

(2) the solicitation of orders by such person, or his representative, in such State in the name of or for the benefit of a prospective customer of such person, if orders by such customer to such person to enable such customer to fill orders resulting from such solicitation are orders described in paragraph (1).

In interpreting P.L. 86-272, the Supreme Court of the United States determined that the term "solicitation" includes "not just explicit verbal requests for orders but also any speech or conduct that implicitly invites an order." Wisconsin Dep't of Revenue v. William Wrigley, Jr., Co., 505 U.S. 214, 223 (1992). Further, the activity doesn't need to be "strictly essential to making requests for purchases," and the activity can be "entirely ancillary to requests for purchases" but must not be an activity the company would engage in outside of making sales. Id. at 228-230.[5]

Wrigley involved multiple activities that Wisconsin argued went beyond solicitation of orders: "replacement of stale gum by sales representatives; the supplying of gum through agency stock checks; the storage of gum, racks, and promotional materials; the rental of space for storage; the regional managers' recruitment, training, and evaluation of employees; and the regional managers' intervention in credit disputes." Id. at 232. The Supreme Court of the United States found that replacing stale gum, supplying gum through agency stock checks and the storage of gum were neither solicitation nor ancillary to solicitation, making them nonexempt activity. Id. at

---

[5] The court provides an example of giving a salesman a car and samples to demonstrate activity that falls under soliciting orders. For comparison, the court explains that salesmen repairing or servicing products sold by the company wouldn't be solicitation of orders because the company would have good reason to do this without the existence of a sales team. While good for making sales, the activity isn't "ancillary to requesting purchases" and assigning the activity to a salesman doesn't convert the act into solicitation. Id. at 229.

233. However, the remaining activities were exempt as their only purpose was facilitating solicitation. Id. at 234. The court concluded that replacing stale gum was unprotected activity because the company would already want to engage in this activity even if it didn't employ a sales force, and the activity must "facilitate the requesting of sales" instead of just facilitating sales. Id. at 233. Further, the court reasoned supplying gum through agency stock checks was not ancillary because plaintiff charged the wholesalers for the stock of gum and thus served a business purpose separate from the solicitation of orders. Id. at 234.[6] The court reasoned both storage of gum and rental of storage space were related to the replacing of stale gum or agency stock checks, making them not ancillary to solicitation. Ibid.

In Chester A. Asher, Inc. v. Dir., Div. of Taxation, 22 N.J. Tax 582, 595-96 (Tax 2006), the court found that the conduct of the taxpayer's drivers in accepting "occasionally" returned product and collecting payment from some customers, was not protected activity. Here the Director argues that the plaintiff's occasional acceptance of returned produce is unprotected activity, thus subjecting plaintiff to taxation in this State. In opposition plaintiff asserts that it was compelled by a federal regulatory requirement to accept returns of produce and, therefore that activity is protected. See, Heublein, Inc. v. South Carolina Tax Comm'n, 409 U.S. 275 (1972).

In Heublein the South Carolina Beverage Control Act controlled the taxpayer's activities in the State.

> Under that Act, only registered producers of registered brands of alcoholic beverages may ship those brands of alcoholic beverages into the State. [S.C. Code ANN.] §§ 4-134, 4-135. Such producers must have a resident representative who has no direct or indirect

---

[6] In addressing this activity, the court noted that it occurs in relation to plaintiff setting up display racks with gum. If the facts stopped at the activity occurring in relation to the displays, the court could conclude it was exempt under 15 U.S.C. § 381(a)(2). However, the court then noted plaintiff charges for the stocking of gum in the displays, which led the court to determine it served a separate business purpose.

13

interest in a local liquor business. §§ 4-131 (3), 4-139. Shipments of liquor into the State may be made only to the producer in care of its representative. § 4-141. Prior to the shipment, the producer must mail a copy of the invoice showing the quantity and price of the items shipped, and a copy of the bill of lading, to the Alcoholic Beverage Control Commission. Immediately after accepting delivery, the representative must furnish the Commission a copy of the invoice showing the time and place of delivery. Ibid. When received, the shipment must be stored in a licensed warehouse of the producer, or, after delivery is complete, the shipment may be transferred to a licensed wholesaler. §§ 4-140, 4-141. Before the goods are shipped to a wholesaler, however, the representative must obtain the Commission's permission to make the transfer. § 4-141. Heublein complied with this regulatory scheme.

[Heublein, 409 U.S. at 277-78.]

When the taxpayer acted to comply with these requirements, South Carolina assessed tax based on the income from taxpayer's sales and argued that the activity exceeded the protection of P.L. 86-272. Id. at 276-278.

The Supreme Court of the United States held the activity for compliance with the referenced Act wasn't protected because P.L. 86-272 doesn't apply to activity required by a state regulatory scheme if the regulation "serves [a] legitimate State purpose other than assuring that the State may tax the firm's income …." Id. at 279-83. The court concluded that P.L. 86-272 won't be read to prohibit States from adopting these regulatory schemes, even though it causes the taxpayer to "have more than the minimum contacts with the State for which [P.L. 86-272] provides tax immunity." Id. at 279. The court noted that Congress didn't address the issue of whether local activities to comply with regulatory schemes would be protected activity under P.L. 86-272. Id. at 281. However, the court reasoned that P.L. 86-272 wasn't enacted by Congress so that States could avoid it by requiring activity that would require more than mere solicitation, rather the State regulatory scheme must serve a legitimate purpose. Id. at 282.

14

In Pomco Graphics, Inc. v. Dir., Div. of Taxation, 13 N.J. Tax 578 (Tax 1993), the court considered the issue of whether the acquisition of a license, required by the State of New Jersey to engage in sales with casinos, subjected the foreign corporation taxpayer to taxation. There, the court held the purchase of a required license was protected activity under P.L. 86-272 because it was ancillary to the solicitation of orders. Id. at 590-91. The court noted that Pomco's "sole purpose" for obtaining the license was to allow the legal solicitation of orders from New Jersey casinos. Id. at 590. Further, the court stated, "[t]he acquisition of a casino license is required 'conduct' to solicit an order." Ibid. The court then explained that New Jersey couldn't require by law that plaintiff engage in activity if it wants to solicit orders and then use that required activity to subject plaintiff to taxation when it would otherwise be immune. Ibid.

Plaintiff asserts that Pomco applies to protect its conduct of accepting rejected produce. The Director cogently points out however that no State action applies to require plaintiff to accept rejected goods. Instead, that requirement is imposed by a federal statute, PACA, which requires wholesalers of produce to accept the return of rejected produce within 24-hours of delivery. The court agrees that on its face Pomco is inapplicable to the matter before it. None of the conduct upon which the final determination is based was required by the State in order that plaintiff might conduct its business in the State. In rejecting the Director's argument that obtaining a license in the State of New Jersey constituted conduct that was more than ancillary to the protected conduct of solicitation of sales, Judge Lario specifically found that

> the acquisition of a casino license is a statutory requirement imposed by the State of New Jersey which is clearly ancillary to solicitation of orders and it is not an in-state business activity beyond the protection of § 381. Although New Jersey may qualify and regulate a person seeking to solicit business from New Jersey casinos, it may not utilize such laws to disqualify that person from the federal immunity granted by § 381. It may not do indirectly that which it is prohibited from doing directly. "§ 381 unquestionably does limit

15

the powers of States to tax companies whose only in-state activity is 'the solicitation of orders'." However, where the only business activity of a person is the "solicitation of orders" within this State, neither the acquisition and renewal of a casino license, which expands the seller's market base, nor the receipt of a certificate of authority to collect New Jersey sales and use tax, is sufficient to deny Pomco immunity from tax under § 381.

[Pomco Graphics, Inc. v. Dir., Div. of Taxation, 13 N.J. Tax 578, 590-91 (1993) (internal citation omitted).]

Plaintiff argues that regardless of whether it is the State or the federal government which requires its acceptance of rejected produce, that such acceptance is required by law and thus constitutes protected conduct as ancillary to the solicitation of orders. The argument has appeal. In order to qualify as a seller of produce in the United States, a corporation must satisfy the requirements of PACA.

The court's review of the PACA and its requirements is at odds with the plaintiff's testimony it was required to accept produce rejected within 24 hours of delivery. According to PACA, it is unlawful for "any dealer to reject or fail to deliver in accordance with the terms of the contract without reasonable cause any perishable agricultural commodity." 7 U.S.C. § 499b(2). "Provided [a] shipment has not already been accepted, either through diversion, unloading or any other act of control, a buyer may reject a shipment by clearly and promptly notifying the seller of his intention to do so within eight hours of arrival for a truck shipment and within 24 hours for a rail shipment." Top 10 Contracting Issues, Rules & Regulations for the Perishable Agricultural Commodities Act, AMS.USDA.GOV, https://www.ams.usda.gov/rules-regulations/paca/top-10-contracting-issues (last visited 5/7/21) (answering the third question, "Can I reject the shipment and what is the procedure to reject?"). "Once title passes, the seller can only regain the produce if the buyer agrees to release it or rejects the product. Ibid. "In most instances the act of acceptance occurs when a buyer unloads product for any reason other than inspection or, diverts the load. A

16

buyer, who accepts product, <u>loses its right to reject and or demand the seller remove the product.</u> <u>Top 10 Contracting Issues,</u> (emphasis added) AMS.USDA.GOV (last visited 5/7/21) (answering the second question, "What is considered acceptance of goods?"). Thus, plaintiff's position that it must accept the return of product at any time within 24-hours of delivery even if accepted by the customer appears to be contrary to the requirements of PACA.

However plaintiff's representative testified that when a delivery was made, the customer would have a team of inspectors and if rejected prior to acceptance, the product would be returned on the truck on which it had been shipped to the customer. The witness further testified that the times when the produce was rejected after it had been taken off the truck and accepted by the customer were "few and far between," although he believed it was the plaintiff's obligation to accept the return, or provide a credit for, such produce. The testimony, which the court accepts as credible, was that a customer's dissatisfaction was most often handled by a credit without the return of the produce. The second most common method of handling the issue was the rejection and return of the produce prior to acceptance, and finally, return of the produce at a later time, but such returns were uncommon. Indeed, the witness testified that usually the rejection of the produce was made prior to acceptance at the time of delivery.

The court finds that to the extent product is rejected prior to acceptance, the Seller has the obligation under PACA to accept the return of the rejected produce. The court agrees that regardless of the source of the requirement, that is whether the requirement is imposed by State or federal law, the conduct of accepting the return of rejected product upon delivery is ancillary to the sale. Indeed, unless and until the product is accepted, under PACA (and most likely under contract law) title does not pass and the product remains the property of the seller. Thus, to the extent that plaintiff demonstrated that product was returned on plaintiff's trucks at the point of

17

delivery and prior to the acceptance of the product, the court concurs that the act of returning rejected produce ancillary to the sale of the product is protected activity under P.L. 86-272.

However, regularly retrieving product on taxpayer's trucks which was accepted by the buyer is neither required by PACA nor conduct protected by P.L. 86-272 as ancillary to the sale of that product. In Chester A. Asher, Inc. v. Dir., Div. of Taxation the court found that the regular activity of the taxpayer's delivery drivers in the collection of payments for products from some customers and on a less regular basis from others, and the occasional acceptance of returns was not protected activity. 22 N.J. Tax 582, 595-98 (Tax 2006). Additionally, the court noted that the delivery drivers may have "on at least one occasion picked up baking supplies for [the taxpayer] and been involved in" an unrelated activity of the taxpayer. Ibid. The court reasoned that the activities did not fall within the scope of solicitation of orders and would exist independent of sales activity and did not help facilitate the requesting of sales. Ibid. Further, the court compared the picking up of "damaged, spoiled, or overshipped packages" with the picking up of stale gum in Wrigley. Ibid.

The court found that although the pickup of returns was de minimis in Asher the collection of past due accounts was not, and that the nature and cumulative activities of the taxpayer during the years under review went beyond the de minimis activities protected by P.L. 86-272 and Wrigley. Id. at 598. In making that determination, the court noted that while the amount of the unprotected activities when compared to the total revenue collected was relatively small, the quantity of the activity was less important than the existence of the company policy and the regularity with which the unprotected activity (there the pickup of returns and collection and past due accounts) occurred. Id. at 599. Thus the court found that the unprotected activity was

"sufficiently systematic to warrant a finding that the activity constitutes a non-trivial connection to New Jersey and is not de minimis." Ibid.

Here, plaintiff's proofs demonstrated that overall less than 5% of the packages of product shipped into New Jersey were "rejected" during each of the years under review. The evidence provided demonstrated that of the packages shipped into New Jersey and returned to plaintiff, either by rejection before acceptance or otherwise, 1% or less were returned on plaintiff's trucks. It is further clear that the majority of those packages returned on plaintiff's trucks were rejected prior to acceptance and within activity protected by P.L. 86-272. Based on the uncontroverted testimony provided, the return of product on plaintiff's trucks, after acceptance, was de minimis in quantity.

Nonetheless, the question is whether the practice of sending plaintiff's trucks into New Jersey to obtain return of produce after its acceptance was "sufficiently systematic to warrant a finding that the activity constitutes a non-trivial connection to New Jersey." Ibid. Without more, the court cannot find that the plaintiff engaged in such activity. The uncontroverted testimony established that the vast majority of the produce returned to plaintiff was rejected prior to acceptance and was ancillary to the sale of the product. Although cross examination established that product was received back by the plaintiff on a regular and systematic basis, the product rejected prior to acceptance and returned to plaintiff on the truck which delivered it, or for which a credit was provided, is protected activity which cannot be considered.

However, the testimony also established that plaintiff engaged in other activity in the State not ancillary to the sale of its product. Specifically, plaintiff's representative testified that during 2006, it would use its trucks to pick up tomatoes from Ag-Mart. The court also finds that this

19

conduct was regular and systematic.[7] The court further finds that such conduct, together with the systematic conduct of sending trucks to New Jersey to pick up accepted but returned product although de minimius, constitutes conduct unprotected by P.L. 86-272.

The Director's attempt to tax plaintiff on the basis of owning property in the State of New Jersey is rejected. The credible, unequivocal and uncontroverted testimony establishes that plaintiff held no ownership interest in any of the CHEP pallets used by it in delivering produce to its customers. Both plaintiff and the CHEP participating customers had arrangements with CHEP USA relative to the usage and recovery by CHEP of such pallets. Ownership was and always remained with CHEP and there is no basis upon which to assert plaintiff's interest in those pallets sufficient to subject it to tax.

With respect to the brown pallets, the credible evidence also established an arrangement similar to the CHEP agreement existed between plaintiff and its customers, such that for each pallet upon which produce was delivered to a customer, a similar pallet was exchanged. The court agrees that such arrangement resulted in there being no pallet remaining in New Jersey belonging to plaintiff upon which taxability can be based.

Additionally, the court finds that during the years under audit neither plaintiff nor any of its employees had any seat on the Vineland Auction or maintained an office in any facility in the State of New Jersey. The uncontroverted testimony of the both the plaintiff and the Director's witnesses was that the plaintiff's employee did not have a seat on the Vineland Auction during any

---

[7] The court rejected plaintiff's attempt to supplement the interrogatories by its submission of questionable check register data for the period extending beyond December 2005. Plaintiff failed to provide such evidence to the Director prior to trial although demanded in interrogatories. The court found that such evidence was hearsay and not subject to the business record rule and could not be authenticated by the witness, and thus excluded it from being submitted.

of the years under appeal. Nor was any credible testimony provided to establish that any employee of plaintiff worked from a location within the State of New Jersey.

Testimony did establish that plaintiff's employee obtained data learned from the Vineland Auction and shared that information with the sales team at plaintiff's "war room." The Director suggests that this "gathering of market data" is unprotected activity and cites Blue Buffalo Co. v. Comptroller of the Treasury, 243 Md. App 693, 712 ( Ct. Spec. App. 2019) as support. In Blue Buffalo, the court found that the gathering of "market opportunities and competitor activities in [] routine reports" was a "business objective distinct from the solicitation of orders." Ibid. The trial court there found that the plaintiff taxpayer "would have reason to gather data about the activities of its competitors independently of whether it deployed a [ ] sales force." Ibid. Here there was no credible evidence that any employee of plaintiff traveled to the Vineland Auction or any other location in the State for the purpose of obtaining the relevant market data. Merely gathering such data from sources within this State, without a presence in this State, does not constitute unprotected conduct.

D. *Income Taxable*

Thus, based on the credible evidence provided, the court finds that for tax year commencing February 1, 2006 and ending January 31, 2007 plaintiff had sufficient conduct in New Jersey beyond mere solicitation of sales that subjected it to tax in this State. The court further finds that the plaintiff did not engage in unprotected conduct in this State for the other tax years under appeal.

E. *Penalties Assessed*

Plaintiff argues the underpayment penalty and amnesty penalty should be abated because it demonstrated defendant's final determination was incorrect, that it qualified for amnesty, and

that it had reasonable cause to believe it was exempt from CBT.  The Director maintains that its final determination was correct and that the penalties are supported by the testimony.

N.J.S.A. 54:49-4(a) provides that a penalty "equal to 5% of the underpayment" is added to the assessment for "any part of any underpayment of tax" unless taxpayer shows a reasonable cause for the underpayment.  Pursuant to N.J.A.C. 18:2-2.7, "[t]he Director is authorized to waive the penalty … 'if the failure to pay any tax when due … is explained to the satisfaction of the Director.'"  Xylem Dewatering Solutions, Inc. v. Dir., Div. of Taxation, 30 N.J. Tax 41, 68 (Tax 2017).  In Xylem, the court held that the penalty should be abated because the taxpayer's failure to pay tax was reasonable.  Id. at 69.  In reaching its decision, the court found taxpayer's position was reasonable, even if ultimately incorrect, because a lack of clear direction from the Division of Taxation and lack of judicial guidance on the issue lead to taxpayer's position.  Ibid.

With respect to tax year ending January 2007 the court finds that the underpayment penalty was properly imposed.  Plaintiff knew or should have known that its actions in sending trucks into the State for the purpose of trucking its related entity's produce to its warehouse facility was not protected activity.  It is clear from the testimony that plaintiff intended to avoid the status by entering into an arrangement to reimburse itself for the services rendered.  The court thus finds that the underpayment penalty for the tax year ending January 2007 is upheld.

Plaintiff further argues that the amnesty penalty imposed by N.J.S.A. 54:53-19(b) should not be assessed because when it filed the returns under appeal, the "amount paid was based on reasonable cause."

N.J.S.A. 54:53-19(b) provides,

> There shall be imposed a 5% penalty, which shall not be subject to waiver or abatement, in addition to all other penalties, interest, or costs of collection otherwise authorized by law, upon any State tax liabilities eligible to be satisfied during the period established

pursuant to subsection a. of this section that are not satisfied during the amnesty period.

Plaintiff argues that it could not have known the full payment of tax due until after the audit of its returns and that the amount it paid was based on what it reasonably believed was due. Plaintiff filed a return under the amnesty program for the tax year ending January 2007 which the court finds did not accurately reflect its liability for tax. Plaintiff's failure to accurately reflect its tax liability subjects it to the penalty set forth in N.J.S.A. 54:53-19.

## CONCLUSION

For the reasons set forth above, the court affirms the final determination as to the taxes, penalties and interest imposed for the year ending January 2007 only. The parties shall provide the court with computations pursuant to R. 8:9-3 within thirty days of the date of this opinion.

Very truly yours,

/s/ Kathi F. Fiamingo

Kathi F. Fiamingo, J.T.C.