MAINE SUPREME JUDICIAL COURT                              Reporter of Decisions
Decision:    2026 ME 30
Docket:      Ken-24-490
Argued:      September 11, 2025
Decided:     April 2, 2026

Panel:       STANFILL, C.J., and MEAD, CONNORS, LAWRENCE, and DOUGLAS, JJ.
Majority:    STANFILL, C.J., and MEAD, LAWRENCE, and DOUGLAS, JJ.
Dissent:     CONNORS, J.

STATE TAX ASSESSOR

v.

FIFTH GENERATION, INC.

MEAD, J.

[¶1]  Fifth Generation, Inc., appeals from a summary judgment entered by the Superior Court (Kennebec County, *Lipez, J.*) vacating a decision of the Board of Tax Appeals and reinstating the State Tax Assessor's assessment of $748,531.95 in withholding, interest, and penalties against Fifth Generation for an audit period spanning from 2011 to 2017.  We agree with the Superior Court that Fifth Generation was not exempt from state income tax during the audit period, and we therefore affirm the judgment.

## I. BACKGROUND

### A. Facts

[¶2]  The facts, as set out in the parties' supported statements of material facts and viewed in the light most favorable to Fifth Generation, *see Avis Rent A Car Sys., LLC v. Burrill*, 2018 ME 81, ¶ 2, 187 A.3d 583; M.R. Civ. P. 56(h), are as follows.

[¶3]  Fifth Generation is a liquor manufacturer and supplier known for producing Tito's Vodka.  Fifth Generation is based in Austin, Texas, and is a subchapter S corporation, a "pass-through entity" for tax purposes.  *See* 36 M.R.S. § 5250-B(1)(C) (2025).  From 2011 to 2017 (the audit period), Fifth Generation supplied a steadily increasing number of cases of vodka to Maine, starting with roughly five and a half cases in 2011 and ending with 6,582 cases in 2017.  Fifth Generation never filed a Maine pass-through-entity withholding return or a Maine income tax return.

[¶4]  Fifth Generation had no real estate in Maine and did not hold itself out to the public as conducting business in Maine during the audit period.  It had at least two employees, based outside of the state, who visited Maine on sales-related trips each year during the audit period.

### 1.    Maine's Three-Tiered System

[¶5]  Maine regulates the sale of spirits in the state using a "three-tiered system" involving (1) suppliers—liquor companies that want to sell their alcoholic products in Maine; (2) a single state wholesaler—the Bureau of Alcoholic Beverage and Lottery Operations (the Bureau); and (3) retailers—state-licensed liquor stores.

[¶6]  During the entirety of the audit period, Fifth Generation was required to ship its products to a "bailment warehouse" operated by Pine State Trading Co., a state subcontractor.[1]  Fifth Generation paid regular "bailment fees" to Pine State during this period.  Typically, a sixty-day supply of spirits was kept in the bailment warehouse.  During the audit period, the State subcontractor, Maine Beverage Co. or Pine State (beginning in June 2014), maintained an online portal that allowed suppliers to keep track of inventory. The Bureau would send low-inventory reports and out-of-stock reports to suppliers.[2]

---

[1]  From the start of the audit period until June 2014, these requirements were governed by a ten-year contract between a company called Maine Beverage Co. (which subcontracted with Pine State for its warehouse space) and the Maine Department of Administrative and Financial Services (DAFS), the department that oversees the Bureau.  From June 2014 onward, Pine State had a contract with the Bureau to provide space to store spirits in their bailment warehouse.

[2]  The parties disagree on whether the quantity of spirits that Fifth Generation would send to the bailment warehouse was based on Fifth Generation's sales projections or if the quantity shipped was based on the required minimum inventory requirements set by the Bureau.

4

[¶7] Alcohol was then sold from the bailment warehouse to the Bureau, which sold it to retailers. The Bureau generated revenue and regulated the price of alcohol through this process. *See* 28-A M.R.S. §§ 83-B, 83-C (2014);[3] 28-A M.R.S. § 1703(5) (2017).[4]

[¶8] During the audit period, Maine required suppliers to use a licensed broker to work with the Bureau. From the start of the audit period to May 2012, Portland Beverage Co. served as Fifth Generation's broker. From May 2012 to the end of the audit period, M.S. Walker, Inc., a Massachusetts-based company, served as Fifth Generation's broker. Fifth Generation gave M.S. Walker broad authorization to work on behalf of Fifth Generation. Fifth Generation also provided incentives to M.S. Walker to sell more of its product. During the audit

---

[3] Since the conclusion of the audit period, these statutes have been amended, though not in any way that affects this appeal. *See* P.L. 2021, ch. 658, § 53 (effective Aug. 8, 2022) (codified at 28-A M.R.S. § 83-B (2025)); P.L. 2019, ch. 13, § 5 (effective Sept. 19, 2019) (codified as subsequently amended at 28-A M.R.S. § 83-B (2025)); P.L. 2023, ch. 632, §§ 1-2 (effective Aug. 9, 2024) (codified at 28-A M.R.S. § 83-C (2025)); P.L. 2023, ch. 516, § B-44 (effective Aug. 9, 2024) (codified as subsequently amended at 28-A M.R.S. § 83-C (2025)); P.L. 2021, ch. 658, §§ 54-57 (effective Aug. 8, 2022) (codified as subsequently amended at 28-A M.R.S. § 83-C (2025)); P.L. 2021, ch. 592, § B-1 (effective Aug. 8, 2022) (codified as subsequently amended at 28-A M.R.S. § 83-C (2025)); P.L. 2019, ch. 404, §§ 3-4 (effective Sept. 19, 2019) (codified as subsequently amended at 28-A M.R.S. § 83-C (2025)); P.L. 2019, ch. 13, § 6 (effective Sept. 19, 2019) (codified as subsequently amended at 28-A M.R.S. § 83-C (2025)); P.L. 2017, ch. 407, § A-115 (effective Aug. 1, 2018) (codified at 28-A M.R.S. § 1703(5) (2025)).

[4] The Legislature amended 28-A M.R.S. § 1703(5) after the audit period concluded, though not in any way that affects this appeal. *See* P.L. 2017, ch. 407, § A-115 (effective Aug. 1, 2018) (codified at 28-A M.R.S. § 1703(5) (2025)).

period, M.S. Walker, acting as Fifth Generation's broker, accessed the warehouse and withdrew spirits several times per year.[5]

## 2. Delayed Transfer of Title

[¶9]  Maine's regulatory scheme required the "delayed transfer of title" to the spirits as a condition of the Bureau's purchase of spirits from a supplier. During the first part of the audit period, the contract between Maine Beverage Co. and DAFS stated, "Product delivered to and stored at Warehouse Facilities shall be the property of the supplier.  The Product shall become the property of the State upon removal from the Warehouse Facilities for shipment to an agency store."

[¶10]  This contract served as the source of the delayed-transfer-of-title requirement for the first part of the audit period.  Then, beginning in 2014, a new law provided that "spirits delivered to and stored at a warehouse approved by the bureau are the property of the supplier.  Spirits become the property of the bureau upon removal from the warehouse for shipment to an agency liquor store."  P.L. 2013, ch. 476, § A-9 (emergency, effective Mar. 16, 2014) (codified at 28-A M.R.S. § 83-C(3) (2014)).  Fifth Generation understood that to sell

---

[5] Although the parties dispute whether the Fifth Generation or its broker had "control of" or access to the spirits once they entered the bailment warehouse, Fifth Generation admits that M.S. Walker accessed the warehouse between two and four times per year during the audit period.

6

alcohol during the entirety of the audit period, Maine's rules and laws required the delayed transfer of title.

[¶11] During the audit period, the process for the Bureau's purchase of spirits proceeded as follows: each month, the warehouse operator, Maine Beverage Co. (from 2011 to June 2014) or Pine State (from July 2014 to 2017), sent Fifth Generation two purchase orders showing the number of cases of alcohol that had been removed from Pine State's bailment warehouse by the Bureau on their way to agency liquor stores. In response to these purchase orders, Fifth Generation sent invoices to Maine Beverage Co. or Pine State showing the amount that the Bureau owed. Subsequently, the Bureau, through Maine Beverage Co. or Pine State, paid Fifth Generation.

## B. Procedural History

[¶12] In 2018, Maine Revenue Services initiated an audit of Fifth Generation and formally demanded that Fifth Generation file a pass-through-entity withholding return for each year during the audit period. Fifth Generation never filed a tax return in response to the Assessor's demands. On August 5, 2019, the Assessor assessed $745,452.18 in withholding, interest, and penalties against Fifth Generation for the income it generated during the audit period. Fifth Generation requested reconsideration of the assessment, and on

August 28, 2019, Maine Revenue Services upheld the assessment and issued an assessment of $748,531.95 of withholding tax, interest, and penalties against Fifth Generation.[6]  Fifth Generation then appealed to the Maine Board of Tax Appeals, which held in March 2021 that the Assessor erroneously determined that there was an income tax nexus with the state and cancelled the assessment.

[¶13]  On April 22, 2021, the Assessor filed a petition under 36 M.R.S. § 151-D(10)(I) (2025)[7] for judicial review of the Board's decision.  Fifth Generation cross-petitioned.[8]  The Assessor moved for summary judgment in

---

[6]  This amount was higher than the August 5, 2019, assessment because additional interest of $3,079.77 had accrued from the date of assessment through the requested reconsideration period (October 15, 2019).

[7]  Section 151-D(10)(I) establishes the unique appeals procedure that allows a de novo review by the Superior Court:

> A determination by the board is not an adjudicatory proceeding within the meaning of that term in the Maine Administrative Procedure Act.  The decision, as adopted, modified or rejected by the board or appeals officer pursuant to this paragraph is the final administrative decision on the appeal and is subject to de novo review by the Superior Court.  Either the taxpayer or the assessor may appeal the decision to the Superior Court and may raise on appeal in the Superior Court any facts, arguments or issues that relate to the final administrative decision, regardless of whether the facts, arguments or issues were raised during the proceeding being appealed, if the facts, arguments or issues are not barred by any other provision of law.  The court shall make its own determination as to all questions of fact or law, regardless of whether the questions of fact or law were raised before the division within the bureau making the original determination or before the board.  The burden of proof is on the taxpayer.

[8]  The Superior Court determined that Fifth Generation lacked standing to bring a cross-appeal because (1) there was no statutory basis for Fifth Generation to bring an appeal, *see* 36 M.R.S. § 151-D; M.R. Civ. P. 80C; and (2) Fifth Generation had prevailed on the merits before the board.  Instead, the Superior Court considered Fifth Generation's arguments in its cross-appeal as arguments it was raising in its opposition to the Assessor's appeal.

8

September 2023. In October 2024, the Superior Court granted the Assessor's motion, entering summary judgment in favor of the Assessor. Fifth Generation timely appealed. M.R. App. P. 2B(c)(1).

## II. DISCUSSION

### A. Standard of Review

[¶14] "We review a grant of a motion for summary judgment de novo, viewing the evidence in the light most favorable to the nonmoving party. A grant of summary judgment will be affirmed if there are no genuine issues of material fact and the undisputed facts show that the prevailing party was entitled to a judgment as a matter of law." *Badler v. Univ. of Me. Sys.*, 2022 ME 40, ¶ 5, 277 A.3d 379 (quotation marks omitted).

### B. Fifth Generation was not subject to a tax exemption.

#### 1. Fifth Generation had a nexus with Maine.

[¶15] Title 36 M.R.S. § 5250-B(2) (2025) requires, with some exceptions not relevant here, that every pass-through entity that does business in Maine withhold income tax. Maine regulations require pass-through entities that have a "nexus" with Maine to withhold income tax that its shareholders or members must pay. 18-125 C.M.R. ch. 803 § .06(A) (effective Sep. 12, 2010); 18-125 C.M.R. ch. 808 § .02 (effective May 20, 2000). A corporation has a "nexus" with

Maine if it (1) does business in Maine (including buying, selling, or procuring services or property); or (2) owns property in Maine (including property that is held by another person in Maine under a lease, consignment, or other arrangement). 18-125 C.M.R. ch. 808 §.03.

[¶16] During the audit period, Fifth Generation retained title to the stock of goods that it shipped to the bailment warehouse. *See* 28-A M.R.S. § 83-C(3) (2014). Section 83-C(3) effectively creates a bailment relationship whereby the supplier maintains title to the store spirits until they are removed from the warehouse for shipment to an agency store. We have previously defined "bailment" as a "delivery of personal property by one person to another in trust for a specific purpose, with a contract, express or implied, that the trust shall be faithfully executed and the property returned or duly accounted for when the special purpose is accomplished, or kept until the bailor reclaims it." *Frost v. Chaplin Motor Co.*, 138 Me. 274, 277, 25 A.2d 225, 226 (1942) (quotation marks omitted). This well-established, black-letter law is founded upon the understanding that the bailor retains ownership in the good while it remains with the bailee. *See, e.g.*, *Cadwallader v. Clifton R. Shaw, Inc.*, 127 Me. 172, 177-80, 142 A. 580, 583-84 (1928). As a result, Fifth Generation maintained

10

title and right to possession to the stock of goods that were placed in the bailment warehouse until they were removed or sold.

[¶17]  Fifth Generation then sold its products from the bailment warehouse to the Bureau, a transaction that occurred within the state.  Because Fifth Generation owned and sold tangible property in Maine, it had a nexus with Maine for income-tax purposes.  *See* 18-125 C.M.R. ch. 808, § .03.

[¶18]  Fifth Generation challenges the nexus determination, asserting that it did not own or sell any tangible property in Maine.  Fifth Generation maintains that the transfer of goods occurred when it sent spirits from Texas via common carrier to the warehouse.

[¶19]  Fifth Generation contends that Maine's commercial code supports its assertion that title passed from Fifth Generation to the Bureau when it shipped the spirits by common carrier.  Title 11 M.R.S. § 2-401(2) (2025), part of the Uniform Commercial Code, provides that in the absence of an explicit agreement, "title passes to the buyer at the time and place at which the seller completes his performance."[9]  Fifth Generation argues that it completed its

---

[9]  As noted above, Fifth Generation's broker entered into an explicit agreement with DAFS that provided, "Product delivered to and stored at Warehouse Facilities shall be the property of the supplier.  The Product shall become the property of the State upon removal from the Warehouse Facilities for shipment to an agency store."

performance when it shipped the product by common carrier to Maine. However, this argument is undercut by Fifth Generation's admission that to sell alcohol in Maine, the State required suppliers to store their product in a bailment warehouse and to delay the transfer of title. Because Maine's regulatory scheme prescribed a specific system and the parties voluntarily entered into contracts that specified when title was transferred, Maine's default rules of contract do not apply. *Id.* § 401(1) ("Subject to [the provisions of the statute] and to the provisions of the Article on secured transactions (Article 9), title to goods passes from the seller to the buyer *in any manner and on any conditions explicitly agreed on by the parties.*" (emphasis added)); *id.* § 401(2) ("*Unless otherwise explicitly agreed,* title passes to the buyer at the time and place at which the seller completes his performance . . . ." (emphasis added)).

[¶20] Fifth Generation cites 28-A M.R.S. § 2073-A(1) (2025), which provides that "a person other than the bureau may not transport spirits into the State or cause spirits to be transported into the State," to support their proposition that Fifth Generation had no legal right to transport spirits into Maine. However, this statute was enacted after the audit period had concluded. *See* P.L. 2021, ch. 658 § 267 (effective Aug. 8, 2022) (codified at 28-A M.R.S. § 2073-A(1) (2025)). From 2014 through the end of the audit period, a Maine

12

statute provided that "[m]anufacturers may transport liquor within the State to liquor warehouses." 28-A M.R.S. § 2073(3)(D) (2014), *repealed by* P.L. 2021, ch. 658 § 266 (effective Aug. 8, 2022).

[¶21]  While we do not find that physical control over the goods while stored within the warehouse facility is determinative, the fact that Fifth Generation had the right, either directly or through an agent, to access and retrieve bottles from the warehouse further supports the contention that Fifth Generation, even if it never actually retrieved bottles, held title to the goods in the warehouse.[10]

[¶22]  Fifth Generation's arguments are further undermined by the summary judgment record, which establishes that Fifth Generation understood that the regulatory scheme required it to store spirits at a bailment warehouse, that the transfer of title to those spirits did not occur until the spirits left the warehouse, and that this transfer occurred within the state.  Supporting this understanding is the timing of the purchase orders—which were sent to Fifth Generation after the spirits had been removed from the warehouse; the fact

---

[10]  We are satisfied that the summary judgment record provides a sufficient factual springboard to review the legal issues presented in this appeal.  We respectfully disagree with the Dissent's suggestion that a remand for further fact finding is necessary to determine whether the bailment "is a fiction designed solely to establish a [tax] nexus or is a real bailment in which Fifth Generation in fact retained control over the supply of Tito's in the warehouse."  Dissenting Opinion ¶ 51.

that M.S. Walker, as Fifth Generation's licensed broker, accessed the warehouse and withdrew spirits several times per year during the audit period; and the fact that the warehouse was called a "bailment warehouse."

[¶23] Fifth Generation contests the Assessor's assertions in its statement of material facts that "spirits delivered to and stored at the Bailment Warehouse remained property of the suppliers," and that "spirits stored at the Bailment Warehouse, including Tito's Vodka, became the property of the State only upon removal from the Bailment Warehouse for shipment to an agency liquor store." However, as discussed above, Fifth Generation acknowledged that Maine rules required the bailment and delayed transfer of title.[11]  Therefore, there is no genuine dispute of material fact as to those facts.

---

[11]  From the start of the audit period to March 2014, it is unclear who communicated these rules to suppliers and how it was done.  Maine Beverage Co.'s contract with DAFS contained these requirements.  Likely, Maine Beverage Co. then instituted these requirements for suppliers.  After March 2014, the compelled bailment and delayed transfer of title became statutory requirements. *See* P.L. 2013, ch. 476, § A-9 (emergency, effective Mar. 16, 2014) (codified at 28-A M.R.S. § 83-C(3) (2014)).

Fifth Generation argues that the nebulous circumstances surrounding these requirements before March 2014 adds weight to its position that title transferred when it completed its performance by shipping the spirits to the bailment warehouse.  However, Fifth Generation's position is contradicted by its admission, without differentiating between different times within the audit period, that Maine required the compelled bailment and delayed transfer of title as part of doing business in Maine.

14

[¶24]  Accordingly, because Fifth Generation owned a stock of goods at the bailment warehouse and it sold products from the bailment warehouse to the Bureau, it had a nexus with Maine under 18-125 C.M.R. ch. 808, § .03.

### 2.  Federal Law Exemption to Pass-Through Taxation

[¶25]  Despite any nexus with the state, a corporation is not subject to income tax, and its shareholders are therefore not subject to pass-through income tax, if it is entitled to an exemption provided by federal law. *See id.* § .02; *see also Peterson v. State Tax Assessor*, 1999 ME 23, ¶ 7, 724 A.2d 610 (explaining that the federal government has "plenary power to regulate interstate commerce, pursuant to the commerce clause of the United States Constitution" and can limit "Maine's broad authority to impose a net income tax on nonresidents who solicit interstate sales in Maine").  Title 15 U.S.C.A. § 381(a) (Westlaw through Pub. L. No. 119-59) provides that "[n]o State . . . shall have power to impose . . . a net income tax on the income derived within such State by any person from interstate commerce if the only business activities . . . are . . . (1) the solicitation of orders . . . for sales of tangible personal property . . . and (2) the solicitation of orders . . . in the name of or for the benefit of a prospective customer."

[¶26]  Because a nexus exists between Fifth Generation and Maine, the next question is whether Fifth Generation is entitled to an exemption from taxation under § 381(a).  *See Peterson*, 1999 ME 23, ¶¶ 7-8, 724 A.2d 610.  To survive summary judgment, the burden is on the taxpayer to "make a prima facie showing of the applicability of the exemption."  *BCN Telecom, Inc. v. State Tax Assessor*, 2016 ME 165, ¶ 13, 151 A.3d 497.

[¶27]  The United States Supreme Court in *Wisconsin Department of Revenue v. William Wrigley, Jr., Co.*, held that the term "solicitation of orders" in § 381(a) includes (1) "requests for purchases" (whether "explicit verbal requests for orders" or "any speech or conduct that implicitly invites an order"); and (2) activities "ancillary to requests for purchases" (i.e., activities that "serve no independent business function apart from their connection to the soliciting of orders").  505 U.S. 214, 223-33 (1992).  The Court noted that to be ancillary to a request for purchases "it is not enough that the activity facilitate *sales*; it must facilitate the *requesting of sales*."  *Id.* at 233.  Additionally, the Court held that in-state activities other than "solicitation of orders" may still benefit from the federal tax exemption if such activities are merely "*de minimis*" (i.e., activities that establish only a trivial connection with the taxing state).  *Id.* at 232.

[¶28]  In determining whether an exemption applies, courts look at each of a business's activities to determine whether the activity fits into a category of exempted activities discussed in *Wrigley*.  In *Wrigley*, for instance, Wisconsin attempted to impose a pass-through income tax on the owners of Wrigley chewing gum; Wrigley employed traveling salespeople based in the state, but all of its orders went through an out-of-state office and were shipped by a common carrier from out of state.  *Id.* at 216-19.  The Supreme Court determined that many of Wrigley's activities in the state could be characterized as "requests for purchases" or "ancillary to requests for purchases" (e.g., providing a car and a stock of free samples to sales representatives; the regional manager's recruitment, training, and evaluation of sale representatives in the state; and the regional managers' interventions in credit disputes).  *Id.* at 228-29, 231-32, 234-35.

[¶29]  The Court emphasized that "Wrigley did not own or lease real property in Wisconsin, did not operate any manufacturing, training, or warehouse facility, and did not have a telephone listing or bank account" that might have created a nexus with the state.  *Id.* at 219.  Notably, however, the Court held that the storage of gum at individual salespersons' homes and the replacement of stale gum by sales representatives at retail stores (for which

retailers were charged) served business functions independent from the solicitation of orders (or ancillary to the solicitation of orders), and therefore the company was not subject to the tax exemption provided by § 381(a). *Id.* at 233-34.

[¶30] Fifth Generation's argument that the compelled bailment and the compelled delay in the transfer of title are activities that are entirely ancillary to the request for purchases is unavailing. It contends that these activities are ancillary because the only reason it complied with these requirements was to avoid imperiling future orders. However, in *Wrigley*, the Court stated that "it is not enough that the activity facilitate *sales*; it must facilitate the *requesting of sales*." 505 U.S. at 233. Despite its assertions, Fifth Generation complied with Maine's requirements primarily to sell alcohol rather than to facilitate future sales. Although Fifth Generation's compliance with these regulations might indirectly relate to its hope for future orders, its business function was most directly the sale of alcohol itself.

### 3. *Heublein*

[¶31] Fifth Generation contends that the Bureau's purpose in requiring the delayed transfer of title and the compelled storage in bailment was to evade the limitations that § 381 placed on the State's power to tax. However, the

Bureau has a legitimate state interest in regulating the sale and distribution of alcohol in the state. *See Heublein, Inc. v. S.C. Tax Comm'n*, 409 U.S. 275, 282-83 (1972); 28-A M.R.S. § 83-C(2) (2014). Localizing the sale of alcohol in Maine is reasonably related to its purpose of regulating the price because it allows the Bureau to more easily establish wholesale prices for items when it purchases the items through a single, in-state warehouse. *See Heublein,* 409 U.S. 275, 282-83 (1972).

[¶32] The Supreme Court has permitted states to regulate solicitation in a manner that might cause an out-of-state company to forfeit its tax immunity. *See id.* at 281-82. In *Heublein*, South Carolina had a regulatory scheme for the sale of alcohol that required suppliers to employ an in-state representative who would receive the alcohol from outside the state and then either store it in an in-state warehouse or transfer it to a licensed in-state private wholesaler. *Id.* at 277-78. Heublein, a Connecticut-based liquor manufacturer, had complied with South Carolina's regulatory scheme, employing an in-state representative to receive shipments before transferring them to a private wholesaler. *Id.* at 276-78. The Court held that because the transfer occurred within the state and did not constitute the solicitation of orders, Heublein was not entitled to immunity under § 381(a). *Id.* at 278-83.

[¶33]  The Court then held that this type of regulatory scheme—which effectively required certain entities to forfeit their tax immunity to do business in the state—is permissible so long as it serves a legitimate state purpose, and it concluded that South Carolina had a legitimate purpose in regulating the sale and distribution of alcohol in the state.[12]  *Id.* at 282-83.  Notably, the Court in *Wrigley*, 505 U.S. at 224, distinguished *Heublein* and left *Heublein's* holding undisturbed because *Heublein* involved a state regulatory scheme designed to regulate the price of alcohol.  Therefore, *Heublein*'s conclusion—that states can impose regulatory schemes that might cause an entity to lose tax immunity so long as they are related to legitimate state interests—remains good law.

[¶34]  Maine, like South Carolina, has a legitimate purpose in regulating the sale and distribution of alcohol in the state.  In order to effectuate this regulation, Maine must have a way to control and supervise the entry process of liquor into the state utilized by liquor distributors before their products can be sold to consumers.  Maine's regulatory scheme allows the State to "ensure proper administrations of the spirits business in the State and protect the

---

[12]  The Supreme Court, using a rational-basis test, determined that South Carolina's Alcoholic Beverage Control Act's requirement that sales occur within the state was reasonably related to South Carolina's legitimate purpose of regulating the wholesale price of alcohol.  *Heublein*, 409 U.S. at 282-83.

public safety." P.L. 2013, ch. 476, preamble. Ensuring proper administration of the spirits business within the state and protecting public safety by regulating the transporting of liquor into the state before it can be sold within the state is undoubtably a legitimate state purpose. Accordingly, the Bureau's requirements do not unlawfully evade limitations created by federal law.

[¶35] As a result of the firm nexus with the state and the still-good law of *Heublein*, we conclude that § 381(a) does not provide an exemption from state tax.

## C.    No Commerce Clause Violation

[¶36] Fifth Generation contends that the requirements of a delayed transfer of title and storage in a bailment warehouse violate the Commerce Clause, U.S. Const. art. I, § 8, cl. 3. "We review issues of constitutional interpretation de novo. A person challenging the constitutionality of a statute bears a heavy burden of proving unconstitutionality, since all acts of the Legislature are presumed constitutional. To overcome the presumption of constitutionality, the party challenging the statute must demonstrate convincingly that the statute and the Constitution conflict." *Goggin v. State Tax Assessor*, 2018 ME 111, ¶ 20, 191 A.3d 341 (alteration and quotation marks omitted).

[¶37]  The Commerce Clause "prohibits state laws that unduly restrict interstate commerce."  *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 514 (2019).  "[I]f a state law discriminates against out-of-state goods or nonresident economic actors, the law can be sustained only on a showing that it is narrowly tailored to advance a legitimate local purpose."  *Id.* at 518 (alteration and quotation marks omitted).  The Supreme Court has held that three-tiered systems of alcohol distribution and sale are "unquestionably legitimate," *see North Dakota v. United States*, 495 U.S. 423, 432 (1990), but has struck down requirements that have discriminated between in-state and out-of-state businesses or individuals.  For example, in *Tennessee Wine,* the Supreme Court struck down a two-year-residency requirement to open a liquor store as part of Tennessee's three-tiered system because it facially discriminated against nonresidents and had a highly attenuated relationship to public health or safety.  *See* 588 U.S. at 539-43.  Similarly, in *Granholm v. Heald*, the Court struck down both New York's and Michigan's laws that created an exemption from the three-tiered system that allowed in-state wineries to sell wine directly to consumers and bypass the wholesaler because the exemption did not apply to out-of-state wineries and thus discriminated against out-of-state businesses.  544 U.S. 460, 493 (2005).

22

[¶38] Here, the Bureau's requirements delaying the transfer of title and storing spirits in a bailment warehouse do not discriminate between in-state and out-of-state businesses and individuals. Both in-state and out-of-state suppliers are subject to the three-tiered system and to income taxation. Accordingly, Fifth Generation's argument fails to provide a constitutional ground for striking down the Bureau's requirements.

**D. The Superior Court did not abuse its discretion when it declined to waive or abate penalties.**

[¶39] Fifth Generation contends that the Superior Court should have waived or abated penalties because it provided substantial authority justifying its failure to pay. Title 36 M.R.S. § 187-B(7)(F) (2025) provides that the Assessor must waive or abate penalties if "[t]he taxpayer has supplied substantial authority justifying the failure to file or pay." "The taxpayer has the burden of proving the grounds for waiver or abatement." *John Swenson Granite, Inc. v. State Tax Assessor*, 685 A.2d 425, 429 (Me. 1996). We have defined the "substantial authority" standard as follows:

> The substantial authority standard is less stringent than the more likely than not standard but more stringent than the reasonable basis standard. There is substantial authority for the tax treatment of an item only if the weight of authorities supporting the treatment is substantial in relation to the weight of authorities supporting contrary treatment.

*Id.* at 429 n.3 (alterations and quotation marks omitted). Moreover, we have held that a position that is "arguable" or that is "merely a colorable claim" does not satisfy the reasonable-basis standard, let alone the higher substantial-authority standard. *State Tax Assessor v. Kraft Foods Grp., Inc.*, 2020 ME 81, ¶ 37, 235 A.3d 837 (quotation marks omitted).

[¶40]  In its appeal, Fifth Generation has cited its interpretation of the federal and state laws discussed above as the basis for its argument that it has presented substantial authority justifying its failure to pay. Although Fifth Generation provides an arguable claim (especially considering that the Board of Tax Appeals reached a different conclusion than the Superior Court did), it does not provide sufficient authority to compel the application of the "substantial authority" standard when one considers the weight of authorities supporting the contrary interpretation. Fifth Generation's arguments hinge on its belief that title to the spirits passed to the Bureau when the spirits were shipped to Maine via common carrier even though it acknowledges that Maine's rules and statute during the audit period required the delayed transfer of title as part of doing business in Maine. *See* 28-A M.R.S. § 83-C(3) (2014). Fifth Generation's belief, in the face of Maine rules and statutes, does not amount to

24

substantial authority.  Accordingly, the Superior Court did not err when it declined to waive or abate penalties.

The entry is:

Judgment affirmed.

––––––––––––––

CONNORS, J., dissenting.

[¶41]  The scope of this dissent is narrow.  I believe that a remand is needed in order to expand the factual record as to the nature and purposes of the "bailment" of Fifth Generation's spirits located in the State-controlled warehouse.

[¶42]  The basic factual predicate is not in dispute: under Maine's version of a "control" State,[13] Fifth Generation may import its Tito's Vodka (Tito's) into the State only if bought by the State; Fifth Generation must deliver Tito's to a warehouse run by a State contractor; and Fifth Generation must maintain a thirty-to-sixty-day inventory of Tito's at the warehouse.  The State wholesaler (the Bureau) removes Tito's from the warehouse when it chooses, and a bill and

––––––––––––––

[13] An "ABC" or "control" State is a state that exercises direct control over the distribution and sale of alcoholic beverages, often through State-run outlets or monopolies.  *See* Paul Byrne & Dmitri Nizovtsev, *Exploring the Effects of State Differences in Alcohol Retail Restrictions*, 50 Int'l Rev. L. & Econ. 15, 16, 18 tbl. 1 (2017); *North Dakota v. United States*, 495 U.S. 423, 431 (1990).

payment between Fifth Generation and the Bureau for the removed Tito's then ensues.

[¶43]   The primary argument asserted by Fifth Generation on appeal is that the presence of Tito's in the warehouse prior to removal by the wholesaler does not provide a legal predicate for the State to require Fifth Generation to withhold Maine taxes because the State compels Fifth Generation to ship Tito's into the warehouse until the spirits are removed by the State.  I agree with the majority that the fact that Fifth Generation is compelled to do so is immaterial under the holding in *Heublein*, and nothing in *Wrigley* or section 381(a) disturbs that holding.  *See Heublein, Inc. v. S.C. Tax Comm'n*, 409 U.S. 275, 279-83 (1972); *Wisc. Dep't of Revenue v. William Wrigley, Jr., Co.*, 505 U.S. 214, 222-35 (1992); 15 U.S.C.A. § 381(a) (Westlaw through Pub. L. No. 119-59).

[¶44]   In *Heublein*, the Supreme Court also stated that if it were persuaded that the State in that decision (South Carolina) had structured its regulations to "evade the intent of [section 381(a)] we would, of course, be reluctant to uphold its actions."  *Heublein*, 409 U.S. at 279.  The Court went on to say that a State could tax when its regulatory scheme serves "legitimate State purposes other than assuring that the State may tax the firm's income," i.e., when the State is "pursuing permissible ends in a manner that Congress did not address."  *Id*. at

282. South Carolina was not a control State, and its framework required a supplier to maintain a supplier employee as a middleman within the State. *See id*. at 277-78. The scheme was deemed to pass the legitimate purpose test because by requiring suppliers "to localize their sales," South Carolina had established a means to check on the accuracy of "records of the quantities, brands, and prices involved at every stage of each liquor sale." *Id*. In sum, requiring an in-state middleman advanced South Carolina's legitimate purpose of ensuring accurate record-keeping.

[¶45] The Maine in-state presence on which the ability to require Fifth Generation to withhold tax is based on storage of Tito's in the State-controlled warehouse. Hence, the question under *Heublein* is whether the State has a legitimate State purpose in this regulatory framework other than ensuring an in-state presence so that a nexus is obtained on which the State can base a tax.

[¶46] The Supreme Court has upheld the States' ability to establish a control framework of liquor regulation. *See Granholm v. Heald*, 544 U.S. 460, 488-89 (2005) (noting that a three-tiered system of supplier-single wholesaler-retailers is "unquestionably legitimate" and that the "Twenty-first Amendment grants the States virtually complete control over whether to permit importation or sale of liquor and how to structure the liquor

distribution system" (quotation marks omitted)); *see also Cherry Hill Vineyard, LLC v. Baldacci*, 505 F.3d 28, 30-31 (1st Cir. 2007) (stating that the "three-tiered system has been justified on multiple grounds: as an efficient means of controlling the distribution of alcoholic beverages, as an effective means of promoting temperance, and as a facilitating means of collecting excise taxes"). The Assessor cites this case law to assert the legitimacy of Maine's framework. But the issue here is not whether a State may enact a control framework in which the State exercises monopoly control over retail sales in order to advance legitimate State purposes in regulating the sale of liquor generally, such as temperance or efficiency in tax collection. Rather, to me the question under *Heublein* is whether the State's declaration that the supplier retains ownership of the spirits shipped into the State-controlled warehouse until their removal from the warehouse by the State serves a purpose other than creating a taxable in-state presence.

[¶47] The record is strikingly sparse on this front. Only one sentence in the Assessor's brief appears to articulate a reason—other than creating a taxable in-state presence—for the delay in the transfer of title once the product is shipped to the State's warehouse: by charging suppliers a "bailment fee," the State "generates revenue."

[¶48]  If the "bailment fee" were in fact a fee, as opposed to simply more tax, then this in theory might be a sufficient legitimate State purpose under a forgiving rational basis analysis.  The fundamental difference between a fee and a tax is that a tax is imposed to raise revenue for general governmental purposes, while fees are intended to cover the cost of providing a service. *See, e.g., Strater v. Town of York*, 541 A.2d 938, 938 (Me. 1988).  If the storage of Tito's in the warehouse were a true bailment in which Fifth Generation was receiving a service beneficial to Fifth Generation, then I agree that the test for taxability would likely be met.

[¶49]  When this matter came before the Maine Board of Tax Appeals, the Board essentially concluded that, based on the record before it, the answer to the question whether there was a legitimate State purpose for the bailment other than taxation was no—the "bailment" was in name only, with Fifth Generation retaining nothing but "bare legal title" and, as such, under the relevant Maine regulation, the spirits could not be taxed.[14]

---

[14]  A tax can be imposed on a foreign corporation that "owns or uses property in Maine," including one that "[m]aintains a stock of goods in this State."  18-125 C.M.R. ch. 808 § .03(B)(3).  The Board concluded that Fifth Generation did not use the warehouse within the meaning of the regulation because Fifth Generation effectively lost control over the spirits once they entered the warehouse.

[¶50] When the Assessor appealed the Board's decision to the Superior Court, the facts and law were reviewed de novo, with a new factual record and no deference to the Board's factfinding or legal reasoning. *See* 36 M.R.S. § 151-D(10)(I) (2025). The summary judgment record presented to the court was voluminous, but the factual material cited in the paragraphs of the relevant statements of material fact in the briefing as to the nature of the "bailment" is meager. The Assessor notes that from time to time, an agent of Fifth Generation removed a few bottles of Tito's from the warehouse, suggesting that Fifth Generation retained control over the spirits in the warehouse. Fifth Generation disputes that the record shows that any non-de minimis removals in fact occurred establishing that it maintained control over the spirits.

[¶51] On remand, a trial could establish whether the "bailment" is a fiction designed solely to establish a nexus or is a real bailment in which Fifth Generation in fact retained control over the supply of Tito's in the warehouse prior to its removal by the Bureau, and whether there were other indicia of an actual bailment in which Fifth Generation, as the bailor, received a benefit from

the bailee. The Assessor could also identify any other legitimate purposes for the delay in the transfer of title aside from generation of a "bailment fee."[15]

[¶52]   In sum, I certainly do not foreclose the possibility that Fifth Generation, in any or all of the tax years in question, engaged in activities that created an in-state nexus such that Fifth Generation was obligated to withhold Maine income tax and should be subjected to penalties for not withholding such tax. But I believe that the record is insufficient as to the legally relevant issue of whether Fifth Generation's storage of Tito's was a true bailment based on which the State had a legitimate purpose to demand that Fifth Generation retain title in the warehouse until the State removed the spirits.

---

Daniel J. Murphy, Esq. (orally), Bernstein Shur, Portland, for appellant Fifth Generation, Inc.

Aaron M. Frey, Attorney General, Thomas A. Knowlton, Dep. Atty. Gen. (orally), and Lawrence S. Delaney, Asst. Atty. Gen., Office of the Attorney General, Augusta, for appellee State Tax Assessor

Kennebec County Superior Court docket number AP-2021-14
FOR CLERK REFERENCE ONLY

---

15   The Assessor has also argued that, aside from storage, Fifth Generation engaged in non-de minimis, non-solicitation activities establishing a nexus sufficient to tax. A trial could include a year-by-year record of the cited activities and their precise nature.